Opinion concurring-in-part and concurring-in-the-result filed by Circuit Judge Wallach.
Prost, Chief Judge.
Around September 2008, in the midst of one of the worst financial crises of the last century, American International Group, Inc. (“AIG”) was on the brink of bankruptcy and sought emergency financing. The Federal Reserve Bank of New York (“FRBNY”) granted AIG an $85 billion loan, the largest such loan to date. Central to this case, the United States (“Government”) received a majority stake in AIG’s equity under the loan, which the Government eventually converted into common stock and sold.
One of AIG’s largest shareholders, Starr International Co., Inc. (“Starr”), filed this suit alleging that the Government’s acquisition of AIG equity and subsequent actions relating to a reverse stock split were unlawful. The U.S. Court of Federal Claims (“Claims Court”) held a trial on Starr’s direct claims, for which Starr sought over $20 billion in relief on behalf of itself and other shareholders. The Claims Court ultimately held that the Government’s acquisition of AIG equity constituted an illegal exaction in violation of § 18(3) of the Federal Reserve Act, 12 U.S.C. § 343, but declined to grant relief for either that adjudged illegal exaction or for Starr’s reverse-stock-split claims. Starr appeals the denial of direct relief for its claims. The Government cross-appeals, arguing that Starr lacks standing to pursue its equity-acquisition claims directly or, alternatively, that the Government’s acquisition of equity did not constitute an illegal exaction.
We conclude that Starr and the shareholders represented by Starr lack standing to pursue the equity-acquisition claims directly, as those claims belong exclusively to AIG. Because this determination disposes of the equity-acquisition claims, the other issues regarding the merits of those claims are rendered moot. We also conclude that the Claims Court did not err in denying relief for Starr’s reverse-stock-split claims.
We therefore vacate the Claims Court’s judgment that the Government committed an illegal exaction and remand with instructions to dismiss the equity-acquisition claims that seek direct relief. We affirm the judgment as to the denial of direct relief for the reverse-stock-split claims.
I. Background [1]
The 2008 financial crisis exposed many of the major financial institutions in the United States to substantial liquidity risks. AIG was no exception.
*958 This case relates to injuries that the Government allegedly inflicted on AIG and its shareholders, including Starr, in the process of saving AIG from bankruptcy.
A
AIG is a publicly traded corporation with various insurance and financial services businesses. Around 2007, it experienced a deteriorating financial condition due in part to a collapse of the housing market. Leading up to the 2008 financial crisis, AIG had become a major participant in various derivatives markets, including by guaranteeing a portfolio of credit-default-swaps (“CDSs”) sold by one of its subsidiaries. These CDSs functioned like insurance policies for counterparties holding debt obligations, which in turn were often backed by subprime mortgages. When the value of mortgage-related assets declined during the 2008 financial crisis, counterparties demanded that AIG post additional cash collateral pursuant to terms of the CDSs or, in the event of a default, pay any remaining positions. By September 2008, AIG was also facing other financial challenges, including increased fund returns from securities lending, a significant decline in its stock price, the prospect of downgraded credit ratings, and difficulty obtaining additional funding. These factors contributed to mounting stress on AIG’s liquidity.
The situation came to a head on Friday, September 12, 2008, when AIG informed the FRBNY that it had urgent liquidity needs estimated between $13 billion — $18 billion.[2] Over the weekend of September 13-14, AIG’s liquidity needs ballooned to $45 billion, then to over $75 billion, threatening its very survival. On the morning of Monday, September 15, another major financial institution, Lehman Brothers, filed for bankruptcy, which made obtaining private funding even more difficult.
By the following day, the FRBNY— realizing that an AIG bankruptcy could have destabilizing consequences on other financial institutions and the economy— invoked § 13(3) of the Federal Reserve Act (or “the Act”), 12 U.S.C. § 343. That statutory provision allows the Federal Reserve Board, “[i]n unusual and exigent circumstances,” to authorize a Federal Reserve Bank to provide an interest-bearing loan to a qualifying entity, “subject to such limitations, restrictions, and regulations as the [Federal Reserve Board] may prescribe.” 12 U.S.C. § 343. Specifically, an entity receiving such loan must “indorse[ ] or otherwise secure[] [the loan] to the satisfaction of the Federal reserve bank” and show that it “is unable to secure adequate credit accommodations from other banking institutions.”[3] Id.
*959 The Federal Reserve Board quickly approved a Terra Sheet for an $85 billion loan under § 13(3) of the Act. In addition to setting forth an interest rate and various fees, the Term Sheet provided that the FRBNY would receive 79.9% equity in AIG.
That same day, September 16, AIG’s Board of Directors (“AIG Board”) met to consider the proposed Term Sheet. They discussed the pros and cons of accepting the loan, including the equity term. AIG’s Chief Executive Officer (“CEO”) at the time, Robert Willumstad, also conveyed to them “that the Secretary of the Treasury had informed him that as a condition to the [loan, he] would be replaced as [CEO].” J.A. 200031. According to the meeting minutes, all but one of the Directors expressed the view “that despite the unfavorable terms of the [loan, it] was the better alternative to bankruptcy for [AIG].”,J.A. 200038. Over the single dissenting Director, the Board voted to approve the Term Sheet. The FRBNY then advanced money to AIG for its immediate liquidity needs, and Mr. Willumstad was replaced as CEO.
On September 22, 2008, AIG entered into a Credit Agreement memorializing the terms of the loan. The Agreement specified that the Government, through “a new trust established for the benefit of the United States Treasury” (“the Trust”), would receive the 79.9% equity in the form of preferred stock that would be convertible into common stock. J.A. 200212. This was the agreement through which the Government acquired AIG equity.[4] The recited consideration for the equity was “$500,000 plus the lending commitment of [the FRBNY].” J.A. 200212. AIG issued the convertible preferred stock and placed it in the Trust in 2009.[5]
The $85 billion loan was, and remains, the largest § 13(3) loan ever granted. It is also the only instance in which the Government obtained equity as part of a § 13(3) loan.
At this time, AIG’s common stock was listed on the New York Stock Exchange (“NYSE”). In the latter part of 2008, AIG’s stock sometimes dipped below $5.00 per share, prompting the NYSE to remind AIG that the NYSE had a minimum share-price requirement of $1.00 per share. The NYSE advised that it would delist stocks that failed to meet the $1.00-per-share requirement after June 30, 2009. By early 2009, AIG’s common stock was occasionally closing below $1.00 per share and was therefore at risk of being delisted.
On June 30, 2009, the same day as the NYSE dead-line, AIG held an annual shareholder meeting at which shareholders voted on a number of proposals to amend AIG’s Restated Certificate of Incorporation. In relevant part, the AIG Board advised shareholders to approve two proposed amendments that would alter the pool of AIG common stock. The first proposed amendment required approval by a majority of the common shareholders *960 (which excluded the Government at the time because it held preferred stock) and would nearly double the amount of authorized common stock from five billion shares to 9.225 billion shares. The proxy statement explained that this increase would “provide the [AIG] Board ... the ability to opportunistically raise capital, reduce debt and engage in other transactions the [AIG] Board ... deems beneficial to AIG and its shareholders.” J.A. 201112.
The second proposed amendment was subject to a wider shareholder vote and would implement a reverse stock split at a ratio of 1:20 but would only affect the three billion issued shares out of the five billion authorized shares of common stock. The proxy statement asserted that “[t]he primary purpose of the reverse stock split [was] to increase the per share trading price of AIG Common Stock” and, accordingly, “help ensure the continued listing of AIG Common Stock on the NYSE.” J.A. 201113.
The first proposed amendment, to increase the total amount of authorized common stock, failed to pass. But a majority of shareholders, including Starr, approved the second proposed amendment toward a 1:20 reverse stock split of the issued common stock. As a result, the amount of AIG issued common stock decreased from approximately three billion shares to approximately 150 million shares, while the total amount of authorized common stock remained at five billion shares. This solution avoided NYSE delisting. It also made available enough unissued shares of common stock (approximately 4.85 billion shares, i.e., over 79.9% of AIG authorized common stock) to allow the Government to convert all of its preferred stock in AIG to common stock.
More than a year later, in 2011, the Government did just that, converting its 79.9% equity from preferred stock to inore than 562 million shares of AIG common stock as part of a restructuring agreement with AIG. Then, between May 2011 and December 2012, the Government sold all of those shares of common stock for a gain of at least $17.6 billion.
AIG ultimately repaid the $85 billion loan plus around $6.7 billion in interest and fees, and remains a publicly traded corporation today.
B
Starr is a privately held Panama corporation with its principal place of business in Switzerland and was one of the largest shareholders of AIG common stock at all times relevant to this case. Its Chairman and controlling shareholder is Maurice Greenberg, who served as CEO of AIG until 2005.
In 2011, Starr filed the underlying suit in the Claims Court against the Government.[6] Starr recognizes that the § 13(3) loan to AIG was “ostensibly designed to protect the United States economy and rescue the country’s financial system” but alleges that the Government used “unlawful means” in what “amounted to an attempt to ‘steal the business.’ ” J.A. 502253, 502257.
Starr asserted claims directly — on behalf of itself and similarly situated shareholders — for individual relief. It also asserted claims derivatively, on behalf of AIG, for relief that would flow to the cor *961 poration. The Claims Court joined nominal defendant AIG as a necessary party for the derivative claims under United States Court of Federal Claims Rule (“RCFC”) 19(a). See Starr Int’l Co. v. United States (“Starr I”), 103 Fed.Cl. 287 (2012). The Claims Court also certified two classes of shareholders and appointed Starr as the representative for both classes: (1) the Credit Agreement Class (generally, shareholders of AIG common stock from September 16-22, 2008, when AIG agreed to the Term Sheet and the Credit Agreement); and (2) the Stock Split Class (gén-erally, shareholders of AIG common stock as of June 30, 2009, the date of the reverse-stock-split vote).[7] Starr Int’l Co. v. United States (“Starr III”), 109 Fed.Cl. 628, 636-37 (2013).
In 2013, the trial court dismissed Starr’s derivative claims after the AIG Board refused Starr’s demand to pursue litigation.[8] Starr Int’l Co. v. United States (“Stair IV”), 111 Fed.Cl. 459, 480 (2013). Starr does not appeal the dismissal of those derivative claims. Our discussion therefore focuses on the claims that Starr, on behalf of itself and the two shareholder classes, continues to press for direct relief.
1
There are two sets of claims corresponding to the various events surrounding the § 13(3) loan to AIG: (1) the “Equity Claims” brought by the Credit Agreement Class and Starr relating to the Government’s acquisition of 79.9% of AIG equity; and (2) the “Stock Split Claims” brought by the Stock Split Class and Starr relating to the 1:20 reverse stock split. Hereinafter, references to Starr include the Credit Agreement Class and the Stock Split Class when discussing their respective claims.
With respect to the Equity Claims, Starr maintains that the Government’s acquisition of 79.9% of AIG’s equity was an illegal exaction because the Federal Reserve Act does not authorize the Government to take equity in a corporation as part of a § 13(3) loan. Starr also asserts, in the alternative, that the Government’s equity acquisition was a Fifth Amendment taking without just compensation and a violation of the unconstitutional conditions doctrine.[9]
*962 Separately, through the Stock Split Claims, Starr alleges injuries from the 1:20 reverse stock split. Even though the proxy statement noted that the reverse stock split was aimed at avoiding NYSE de-listing, Starr assigns it a more nefarious intent. According to Starr, the Government wanted to increase the relative amount of AIG’s unissued common stock to above 79.9% so that it could convert all of its preferred stock into common stock. The Government allegedly foresaw that the proposed amendment to increase the total amount of authorized AIG common stock (including unissued shares) would not pass a common shareholder vote — a vote that the Government did not control — so it “deliberately engineered” the reverse stock split to guarantee a decrease in the number of issued shares, which would result in a corresponding increase in the proportion of unissued shares to over 79.9%. J.A. 502327. Starr alleges that this scheme completed the Government’s taking of shareholder interests and “deprive[d] [Starr] of its right to block further dilution of its interests in AIG.” Appellant’s Opening Br. 58.[10]
2
The Claims Court allowed Starr to proceed to trial on the claims that Starr had asserted directly. In relevant part, the court determined at the pleading stage that “Starr has standing to challenge the FRBNY’s compliance with Section 18(3) of the [Act].” Starr Int’l Co. v. United States (“Starr II”), 106 Fed.Cl. 50, 62 (2012). It later reaffirmed its ruling on direct standing despite new developments asserted by the Government. Starr IV, 111 Fed.Cl. at 481-82. The Government moved to certify the question of direct standing for interlocutory appeal, but the trial court denied that motion, in part, to develop a “full evidentiary record” on the issue. Starr Int’l Co. v. United States (“Starr V”), 112 Fed.Cl. 601, 605-06 (2013). The trial court did not, however, revisit the question of standing after trial, noting only that it “ha[d] addressed a number of jurisdictional and standing questions at earlier stages of th[e] case.” Starr VI, 121 Fed.Cl. at 463.
On the Government’s motion, the Claims Court dismissed Starr’s unconstitutional conditions claim.[11] Starr II, 106 Fed.Cl. at 83. The Claims Court then proceeded to a thirty-seven-day trial on the remaining claims, all of which sought direct shareholder relief.
Following trial, the court held that the Government’s acquisition of AIG equity was not permitted under the Federal Reserve Act and was therefore an illegal exaction. Starr VI, 121 Fed.Cl. at 466. The court, however, declined to grant Starr any monetary relief for the adjudged illegal exaction, on the ground that “the value of the shareholders^] common stock would have been zero” absent the § 13(3) loan. Id. at 474. The court found that Starr was actually helped, rather than harmed, by the Government because by extending the $85 billion loan to AIG, “the Government significantly enhanced the value of the AIG shareholders’ stock.”[12] Id.
*963 The court further denied relief for the Stock Split Claims, finding that the primary purpose for the reverse stock split was to avoid delisting by the NYSE, not to avoid a shareholder vote as Starr had alleged. Id. at 455-56.
Starr and the Government cross-appeal from the judgment of the Claims Court. We have jurisdiction over these appeals pursuant to 28 U.S.C. § 1295(a)(3).
II. Discussion
Stan’ argues with respect to the Equity Claims that the trial court erred in denying monetary relief for an illegal exaction and, alternatively, in dismissing its unconstitutional conditions claim.[13] Starr separately argues that the trial court erred in denying relief for its Stock Split Claims.
The Government contends . that Starr lacks standing to pursue the Equity Claims on behalf of itself and other shareholders because those claims are exclusively derivative and belong to AIG. Alternatively, the Government asks us to reverse the trial court’s conclusion that the equity acquisition was an illegal exaction vis-á-vis Starr.
We review the Claims Court’s conclusions of law, including that of standing, de novo. Norman v. United States, 429 F.3d 1081, 1087 (Fed. Cir. 2005). We review any factual findings, including those underlying the standing analysis and the denial of relief for the Stock Split Claims, for clear error. Id.; Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).
Before we can address the merits of Starr’s claims, we consider whether Starr has standing to pursue those claims directly, on behalf of itself and other shareholders. See Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) (“Standing is a threshold jurisdictional issue[ ] ... and therefore may be decided without addressing the merits of a determination.”). For the reasons below, we conclude that it does not have direct standing to pursue the Equity Claims. Accordingly, we have no occasion in this case to address whether the Government’s acquisition of AIG equity was an illegal exaction; what damages, if any, would attach; and whether the unconstitutional conditions doctrine has any applicability in this case.[14] We do, however, address the merits of Starr’s appeal with respect to the Stock Split Claims.[15]
*964 A
“Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto.” Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). In keeping with this principle, the doctrine of standing “serv[es] to identify those disputes which are appropriately resolved through the judicial process.” Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The Claims Court, “though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III.” Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (citation omitted). The plaintiff bears the burden of showing standing, and because standing is “an indispensable part of the plaintiffs case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, ie., with the manner and degree of evidence required at the successive stages of the litigation.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
For a party to have standing, it must satisfy constitutional requirements and also demonstrate that it is not raising a third party’s legal rights. Kowalski v. Tesmer, 543 U.S. 125, 128-29, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). Unless otherwise noted below, we assume arguendo— as the parties do — that Starr has satisfied the requirements of constitutional standing derived from Article III, namely: (1) an “actual or imminent” injury-in-fact that is “concrete and particularized”; (2) a “causal connection between the injury and the conduct complained of’; and (3) “likely[ ] ... redressfebility] by a favorable decision.” Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130 (internal quotation marks omitted). We focus, instead, on the third-party standing requirement. The Concurrence faults us for not addressing constitutional standing first, but “[i]t is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits.”[16] Ruhrgas, 526 U.S. at 585, 119 *965 S.Ct. 1563; see, e.g., Kowalski, 543 U.S. at 129, 125 S.Ct. 564 (assuming Article III standing to “address the alternative threshold question” of third-party standing).
The Supreme Court has historically referred to the principle of third-party standing as a “prudential” principle: “that a party ‘generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.’”[17] Kowalski, 543 U.S. at 129, 125 S.Ct. 564 (quoting Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); see also Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd., 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990) (calling the limitation a “longstanding equitable restriction”). This principle of third-party standing “limit[s] access to the federal courts to those litigants best suited to assert a particular claim.”[18] Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). It also recognizes that, as is the case here, the third-party right-holder may not in fact wish to assert the claim in question. See Singleton v. Wulff, 428 U.S. 106, 116, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (distinguishing from a third-party’s inability to assert a claim).
Starr submits that it satisfies the third-party standing principle because the Government’s acquisition of equity harmed Starr’s personal “economic and voting interests in AIG,” independent of any harm to AIG. Appellant’s Resp. & Reply Br. 24. The Government submits that this case presents “classic derivative claim[s]” that belong exclusively to AIG. Oral Argument 33:13-33:24.
Because Starr presses the Equity Claims under federal law, federal law dictates whether Starr has direct standing. Cf. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (“[A]ny common law rule necessary to effectuate a private cause of action ... is necessarily federal in character.”); see also Wright & Miller et al., Federal Practice & Procedure § 1821 (“[I]n suits in which the rights being sued upon stem *966 from federal law, federal law will control the issue whether the action is derivative,”)- But as the parties recognize, the law of Delaware, where AIG is incorporate ed, also plays a role. See Government’s Principal & Resp. Br. 31 (stating that “[t]he principles for distinguishing direct from derivative claims are well-established and consistent across federal and state law” and applying Delaware law); Appellant’s Resp. & Reply Br. 24, 26-31 (applying Delaware law for distinguishing between direct and derivative claims).
In the context of shareholder actions, both federal law and Delaware law distinguish between derivative and direct actions based on whether the corporation or the shareholder, respectively, has a direct interest in the cause of action. Under federal law, the shareholder standing rule “generally prohibits shareholders from initiating actions to enforce the rights of [a] corporation unless the corporation’s management has refused to pursue the same action for reasons other than good-faith business judgment.” Franchise Tax Bd., 493 U.S. at 336, 110 S.Ct. 661. Only “shareholders] with a direct, personal interest in a cause of action,” rather than “injuries [that] are entirely derivative of their ownership interests” in a corporation, can bring actions directly. Id. at 336-37, 110 S.Ct. 661.
Under Delaware law, whether a shareholder’s claim is derivative or direct depends on the answers to two questions: “(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?” Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004) (en banc). To be direct, a claim need not be based on a shareholder injury that is “separate and distinct from that suffered by other stockholders.” Id. at 1035 (internal quotation marks omitted). A claim may be direct even if “all stockholders are equally affected.” Id. at 1038-39.
There exists a “presumption that state law should be incorporated into federal common law” unless doing so in a particular context “would frustrate specific objectives of the federal programs.” Kamen, 500 U.S. at 98, 111 S.Ct. 1711. And this presumption “is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards.” Id. Relevant here, the Supreme Court has observed that “[c]orporation law is one such area.” Id.; see also Burks v. Lasker, 441 U.S. 471, 478, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) (“Congress has never indicated that the entire corpus of state corporation law is to be replaced simply because a plaintiffs cause of action is based upon a federal statute.”). Delaware law is consistent with, and does not frustrate, the third-party standing principle under federal law. See Kowalski, 543 U.S. at 130, 125 S.Ct. 564 (stating that “a party seeking third-party standing” must show a “ ‘close’ relationship with the person who possesses the right” and a “ ‘hindrance’ to the possessor’s ability to protect his own interests”); Franchise Tax Bd., 493 U.S. at 336, 110 S.Ct. 661 (setting forth the shareholder standing rule). Accordingly, Delaware law is applicable to the question of whether the Equity Claims are direct in nature.
Although Starr claims that it was directly affected by the Government’s acquisition of equity, its alleged injuries require first showing that AIG was either “caused to overpay for [the loan] that it received in exchange” for newly issued stock or forced to issue that stock without any legal basis whatsoever. Gentile v. Ros *967 sette, 906 A.2d 91, 99 (Del. 2006). Typically, “claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative.” Id. “Such claims are not normally regarded as direct, because any dilution in value of the corporation’s stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction.” Id. The proper remedy for such harms usually goes to the corporation as “a restoration of the improperly reduced value.” Id.
The injuries that Starr alleges with respect to the Government’s acquisition of AIG equity are therefore quintessentially “dependent on an injury to the corporation,” and any remedy would flow to AIG. Tooley, 845 A.2d at 1036. Absent an applicable recognition under federal or Delaware law that Starr’s alleged injuries give rise to a direct cause of action, the Equity Claims would be exclusively derivative in nature.
We make a couple of observations at the outset to provide context to our discussion. We then proceed to address whether Starr has direct standing under Delaware law to pursue the Equity Claims despite their derivative character. Finally, we consider several alternative theories of direct standing that Starr submits, including theories under federal law.
1
First,, we observe that Starr does not appear to meaningfully distinguish among the various Equity Claims for purposes of standing. Rather, Starr generally characterizes the Equity Claims as alleging “the wrongful expropriation of [its] economic and voting interests in AIG for the Government’s own corresponding benefit.” Appellant’s Resp. & Reply Br. 22. Because Starr has the burden of demonstrating standing and relies primarily on this theory of harm, we do too. See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (“[Standing cannot be inferred argumentatively from averments in the pleadings.” (internal quotation marks omitted)).
Second, we address Starr’s argument that its case for direct standing is particularly compelling because the Government’s acquisition of newly issued equity should be equated with a physical exaction of stock directly from AIG shareholders. Specifically, Starr urges us to view the equity acquisition as being “indistinguishable from a physical seizure of four out of every five shares of [shareholders’] stock.” Appellant’s Resp. & Reply 24-25. To do otherwise, Starr submits, would be to “elevate form over substance.” Id. at 24.
We decline Starr’s invitation to view the challenged conduct as it wishes. There is a material difference between a new issuance of equity and a transfer of existing stock from one party to another. Newly issued equity necessarily results in “an equal dilution of the economic value and voting power of each of the corporation’s outstanding shares.” Rossette, 906 A.2d at 100. In contrast, a transfer of existing stock creates an individual relationship between the transferor and the transferee. Equating AIG’s issuance of new equity with a direct exaction from shareholders would largely presuppose the search for a direct and individual injury — e.g., the “separate harm” that results from “an extraction from the public shareholders and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest.” Id. We therefore do not equate the Government’s acquisition of equity with a physical seizure of Starr’s stock.
*968 2
Having addressed the threshold issues above, we turn to Starr’s primary argument for standing. Starr submits, as the Claims Court decided at the pleading stage, that the Equity Claims fall within a “dual-nature” exception under Delaware law.
This dual-nature exception recognizes that certain shareholder claims may be “both derivative and direct in character.” Rossette, 906 A.2d at 99. This exception addresses circumstances when a “reduction in [the] economic value and voting power affected the minority stockholders uniquely, and the corresponding benefit to the controlling stockholder was the product of a breach of the duty of loyalty well recognized in other forms of self-dealing transactions.” Id. at 102. Accordingly, shareholder claims are both derivative and direct under Delaware law when two criteria are met: “(1) a stockholder having majority or effective control causes the corporation to issue ‘excessive’ shares of its stock in exchange for assets of the controlling stockholder that have a lesser value,” and “(2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.” Id. at 100; see also Gatz v. Ponsoldt, 925 A.2d 1265, 1278 (Del. 2007) (same).
Starr argues that the Equity Claims fall within the dual-nature exception because the Government — though not a majority stockholder when it acquired AIG equity— was the “controlling” party that caused terms of the § 13(3) loan to be unduly favorable to itself, at the expense of AIG shareholders. To establish “control” at the time of the equity acquisition, Starr relies on the trial court’s finding that the Government, “as lender of last resort,” used “a complete mismatch of negotiating leverage” to “force AIG to accept whatever punitive terms were proposed” for - the § 13(3) loan. Starr VI, 121 Fed.Cl. at 435. The trial court found that the Government had “control” in .this sense starting from September 16, 2008 (the date of the Term Sheet). Id. at 447-48. We assume, without deciding, that the Government had such leverage over AIG as of that date.
Starr’s emphasis on such leverage, however, misses the mark under the dual-nature exception’s requirement for “majority or effective control.” The dual-nature exception stems from a concern about the “condonation of fiduciary misconduct” at the expense of minority shareholders. Rossette, 906 A.2d at 102; see also Feldman v. Cutaia, 956 A.2d 644, 657 (Del. Ch. 2007) (“[I]t is' clear from [Rossette and Gatz] that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists. Indeed, any other interpretation would swallow the general rule that equity dilution claims are solely derivative .... ”). Although “control” does not necessarily require the self-dealing party to be a pre-existing majority stockholder, Delaware case law has consistently held that a party has control only if it acts as a fiduciary, such as a majority stockholder or insider director, or actually exercises direction over the business and affairs of the corporation. See Feldman, 956 A.2d at 657 (stating the “well-established test for a controlling stockholder under Delaware law”); Gilbert v. El Paso Co., 490 A.2d 1050, 1055 (Del. Ch. 1984) (stating that a minority shareholder may have “control” through an “actual exercise of direction over corporate conduct”); see, e.g., Gatz, 925 A.2d at 1280-81 (requiring a “fiduciary [who] exercises its control over the corporate machinery to cause an expropriation of economic value and voting power from *969 the public shareholders”); In re Tri-Star Pictures, Inc., 634 A.2d 319, 329-30 (Del. 1993) (considering whether there was “a fiduciary relationship” before determining if shareholders suffered individual harm); Carsanaro v. Bloodhound Techs., Inc., 65 A.3d 618, 658 (Del. Ch. 2013) (extending the rationale for the dual-nature exception to “non-controller issuances” caused by “insider[ ]” directors owing fiduciary duties to shareholders).
Outside third parties with leverage over a transaction, even in a take-it-or-leave-it scenario, do not necessarily have a responsibility to protect the interests of a coun-terparty, less so the interests of a counter-party’s constituents. Starr has not shown that the Government, through its alleged leverage, owed any fiduciary duties to Starr at the time of the equity acquisition. Cf. In re J.P. Morgan Chase & Co. S’holder Litig., 906 A.2d 766, 774-75 (Del. 2006) (observing that the dual-nature exception has “no application ... where the entity benefiting from the allegedly diluting transaction ... is a third party rather than an existing significant or controlling stockholder” (alterations in original) (internal quotation marks omitted)). Nor has Starr sufficiently shown that the Government actually exercised direction over AIG’s corporate conduct, even assuming that the AIG Board was faced with a dire dilemma between accepting a § 13(3) loan or filing for bankruptcy. While there of course may be instances in which the Government does exercise the requisite “control,” the circumstances here do not arise to that level.
The Claims Court nevertheless found the Government to be “sufficiently analogous” to a party owing fiduciary duties to AIG shareholders. Starr II, 106 Fed.Cl. at 65. It reasoned that the Government had a “preexisting duty” to AIG shareholders under the Fifth Amendment not to take private property for public use without paying just compensation.” Id. Although Starr similarly argues that the Government had a “duty” under the Fifth Amendment, which we address in more detail below, it does not expressly defend the trial court’s analogy equating the Government’s role to that of a corporate fiduciary for purposes of the dual-nature exception. See Appellant’s Resp. & Reply Br. 26-29; Oral Argument 6:50-6:53. Starr does not provide any controlling authority that would support the analogy. And we see no rationale to support it.
Therefore, Starr has not demonstrated that it has direct standing to pursue the Equity Claims by virtue of the dual-nature exception under Delaware law.
3
Starr submits several other theories in the alternative to argue that it has direct, not just derivative, standing: (1) the Supreme Court recognizes that the circumstances of this case give rise to direct claims; (2) the Government intentionally took away AIG shareholder voting rights that could have undermined the Government’s interest in AIG; (3) the Government violated the Fifth Amendment rights of shareholders; and (4) the Government “directly] targeted” AIG shareholders. Appellant’s Resp. & Reply Br. 29-35. Starr does not frame these arguments to align with the Supreme Court’s recognition that it may be necessary, in some circumstances, to grant a third party standing to assert the rights of another. Kowalski, 543 U.S. at 129-30, 125 S.Ct. 564. Rather, Starr attempts to bypass the third-party standing principle and submits each of these theories as an independent ground for direct standing. We address each in turn.
a
Starr argues that the Supreme Court has recognized direct standing “[i]n a case *970 with similarities to” the instant litigation. Appellant’s Resp. & Reply Br. 33. It relies on Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957), for support. We reject this argument.
Starr premises its reliance on Alleghany by arguing that to establish standing under federal law, “a plaintiff need only show a ‘concrete and particularized’ ‘injury in fact’ which may be redressed by a favorable decision.” Appellant’s Resp. & Reply Br. 33 (quoting Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130). That is a recitation of a portion of the constitutional requirements for standing. As we have already explained, though, Starr must also satisfy principle of third-party standing, not just the minimum constitutional requirements.
Alleghany is distinguishable and did nothing to alter the principle of third-party standing. The minority shareholders in that case filed an action against the corporation, Alleghany, to restrain it from issuing a new class of preferred stock. 353 U.S. at 153, 158-59, 77 S.Ct. 763. The shareholders also sought to set aside orders by the Interstate Commerce Commission (“ICC”) approving the new issuance (as purportedly required by statute). Id. The Supreme Court held that the threatened dilution of the minority shareholders’ equity “provided sufficient financial interest to give them standing” to challenge the ICC’s orders. Id. at 160, 77 S.Ct. 763.
Notably, the gravamen of the dispute in Alleghany was between shareholders on one side and the corporation (and ICC) on the other. The shareholders were minority stakeholders, and there is no indication that the corporation itself was harmed by the challenged conduct. Accordingly, there was no issue as to whether the claims belonged derivatively to shareholders suing on behalf of the corporation. As the Court observed, it was hot presented with a case “where the injury feared [wa]s the indirect harm which may result to every stockholder from harm to the corporation.” [19] Id. at 159-60, 77 S.Ct. 763 (internal quotation marks omitted) (quoting Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 487, 50 S.Ct. 378, 74 L.Ed. 980 (1930)). The only dispute with respect to standing was whether the threatened dilution of minority shareholder interests constituted injury-in-fact, a constitutional requirement of standing.
Here, in contrast, Starr’s interests are allegedly aligned with, not adverse to, the corporation. Starr contends that the Government’s acquisition of equity, in addition to injuring AIG, harmed all AIG shareholders “on a ratable basis, share for share.” J.A. 501694, 502227; see also Oral Argument 8:15-8:37 (“Starr was not affected differently than other shareholders with respect to the fact that it lost 80% of its voting control.... [I]t was not proportionally affected differently.”). We must, therefore, determine whether Starr has standing to seek direct relief, not just derivative relief, for the Equity Claims — the issue on which our standing analysis focuses. It is not enough that, under Alleghany, the dilution of Starr’s equity might establish injury-in-fact.
In short, the Alleghany Court, under very different circumstances, had no occa *971 sion to address principle of third-party standing or the distinction between derivative and direct shareholder actions. We agree with the Government that Alleghany did not “spawn a separate doctrine”' of direct standing or bypass the principle of third-party standing. Oral Argument 81:38-33:24.
We are thus not persuaded that Allegha-ny grants Starr direct standing to pursue the. Equity Claims.
b
Starr separately argues that it has direct standing under Delaware law because the Government “intentionally nullified” its “voting rights.” Appellant’s Resp. & Reply Br. 29. As we have noted, the general dilution of voting power that Starr complains of was dependent on AIG’s equity being unlawfully taken from the corporation itself and does not also give rise to direct claims under the dual-nature exception. We focus here, as Starr does,' on another, narrower, harm that Starr alleges the AIG shareholders 'suffered: the loss of a common shareholder vote to block the Government’s ability to obtain preferred stock and thereby “undermine the Government’s interest in AIG.” Id. at 30 (internal quotation marks omitted).
Specifically, Starr asserts that the Government had expected to acquire warrants at the time it proposed the Term Sheet but later used its “control” of AIG to change the form of equity in the Credit Agreement to preferred stock. Starr alleges, and the trial court found, that by changing the form of equity from warrants to preferred stock, the Government avoided a common shareholder vote on whether or not the Government would have been able to exercise its warrants.[20]
The Government argues that Starr has waived any argument based on a purported deprivation of a procedural voting right to block the exercise of warrants. Having reviewed the record, we agree that Starr has waived this argument. Although the trial court found that one reason the Government obtained AIG equity in the form of preferred stock was to avoid a shareholder vote, Starr did not separately pursue direct relief on that basis.[21]
Even if Starr had preserved a claim for relief based on losing a specific shareholder vote, Starr, has not shown that that injury would give rise to a direct claim. Starr’s argument in this regard rests on a single reported case, Condec Corp. v. Lunkenheimer Co., 230 A.2d 769 (Del. Ch. 1967). In Condec, the defendant- corporation’s management .had issued equity to a third-party bidder designed to divest the plaintiff shareholder of its majority interest in the corporation and thereby thwart that shareholder’s takeover bid. Id. at 771-73. The court in Condec granted relief to the frozen-out shareholder, noting that the corporation’s issuance of stock “was not connected with ... [any] proper corporate purpose” and “was clearly unwarranted because it unjustifiably str[uek] at the very *972 heart of corporate representation.” Id. at 777.
Condec is distinguishable because the Government, again, was not a fiduciary to Starr as of the date it acquired AIG equity and thus could not have violated any tenet of corporate representation. In addition, the Condec court did not discuss standing in any detail. Id. To the extent it found direct standing based entirely on the loss of a right to vote, as Starr contends, that rationale has since been rejected. The Delaware Supreme Court has held that “the concept of a ‘special injury,’ ” including one regarding “the right to vote, or to assert majority control,” “is not helpful to a proper analytical distinction between direct and derivative actions.” Tooley, 845 A.2d at 1035 (internal quotation marks omitted). Thus, Starr’s reliance on Condec is misplaced.[22]
Starr has neither preserved nor supported its theory that the Government’s purported nullification of a collective majority voting interest is sufficient for direct standing.
c
We turn next to Starr’s reliance on the Fifth Amendment as an independent basis for direct standing. This theory fares no better.
Starr argues that the Government has a duty not to violate the Fifth Amendment’s Takings Clause because the Fifth Amendment creates “ ‘a special relationship’ ” between AIG’s shareholders and the Government. Appellant’s Resp. & Reply Br. 34 (quoting Vincel v. White Motor Corp., 521 F.2d 1113, 1118 (2d Cir. 1975)). Starr does not cite any support for its submission that the Fifth Amendment’s Takings Clause creates a Government “duty.” And even if such a duty were to exist, Starr has not demonstrated why that duty would flow directly to a corporation’s shareholders rather than the corporation in the context of an equity transaction that affects all preexisting shareholders collaterally. See Golden Pac. Bancorp. v. United States, 15 F.3d 1066, 1073 & n.14 (Fed. Cir. 1994) (holding that a shareholder “has no claim independent of those of [the corporation],” even though the corporation alleged that “the government’s action deprived [shareholders] of the value of their stock” (internal quotation marks omitted)). Starr, in short, has failed to carry its burden of demonstrating that the Fifth Amendment itself provides a basis for direct shareholder standing.
d
Finally, we address Starr’s contention that it has direct standing because AIG’s shareholders were singled out as the “direct target[ ] of an illegal act.” Appellant’s Resp. & Reply Br. 31. The Government argues that “Starr’s hypothesis [in this regard] is untethered to reality.” Government’s Reply Br. 10. We agree with the Government.
Starr relies on the trial court’s findings that “the Credit Agreement’s intended punitive effect was ‘immediately understood’ ” and that AIG shareholders “ ‘were the parties directly affected by the Government’s ... action.’ ” Appellant’s Resp. & Reply Br. 32-33 (quoting Starr VI, 121 Fed.Cl. at 447, 465). The trial court also *973 characterized the terms of the loan as “punitive” or “draconian” to AIG. See, e.g., Starr VI, 121 Fed.Cl. at 431, 435-36, 451. But Starr does not sufficiently explain why the Government’s subjective motivations are relevant to the inquiry into direct standing.
And while punitive measures against a corporation may ultimately be borne by its shareholders, a finding that those measures targeted shareholders directly is a wholly different matter.[23] To be sure, there is some testimony in the record that the Government desired to penalize AIG’s shareholders. For instance, Starr points to testimony purportedly showing that “[t]he Government ... specifically said ‘we want to punish [AIG] shareholders’” with the equity term. Oral Argument 10:04-10:28; see also id. at 11:59-12:23; Appellant’s Resp. & Reply Br. 32. The trial court, however, did not go as far as to reach a conclusion that the Government wanted to punish AIG shareholders directly.[24] And in our appellate function we do not make such a factual finding. See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986) (holding that a court of appeals “should not simply have made factual findings on its own”); Atl. Thermoplastics Co. v. Faytex Corp., 5 F.3d 1477, 1479 (Fed. Cir. 1993)(“Fact-finding by the appellate court is simply not permitted.”).
In sum, while we have no reason to doubt that Starr was affected by the Government’s acquisition of AIG equity, Starr has not established any ground for direct standing under either federal or Delaware law. The alleged injuries to Starr are merely incidental to injuries to AIG, and any remedy would go to AIG, not Starr. The Equity Claims are therefore exclusively derivative in nature and belong to AIG, which has exercised its business judgment and declined to prosecute this lawsuit.
We need not reach the remaining issues on appeal with respect to the Equity Claims, including the question of whether the equity term was permissible under § 13(3) of the Act. We vacate the Claims Court’s decisions regarding the merits of the Equity Claims, and remand for dismissal of those claims.[25]
B
We turn now to Starr’s remaining direct claims — the Stock Split Claims based specifically on how the Government, after obtaining AIG equity, managed to convert its preferred stock to common stock. Starr submits that the Claims Court clearly erred in denying those claims based on the record evidence. “A finding is ‘clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake *974 has been committed.” Renda Marine, Inc. v. United States, 509 F.3d 1372, 1378 (Fed. Cir. 2007) (internal quotation marks omitted) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).
According to Starr, “the only permissible view of the evidence is that the Government structured and timed the reverse stock split to deprive AIG common shareholders of their right to vote as a class to block” the Government’s exchange of preferred stock for common stock. Appellant’s Resp. & Reply Br. 66. Starr raises three features of the reverse stock split that, contrary to the trial court’s findings, are allegedly objectionable. First, Starr argues that the use of the 1:20 ratio was higher than necessary .to avoid delisting. Second, it relies on the lack of any explanation for why the reverse stock split applied only to issued shares rather than all of AIG’s authorized shares. Third, Starr asserts that the vote on the reverse stock split was delayed until the last day possible to force shareholders to vote in favor of it to avoid NYSE delisting.
Despite these pieces of circumstantial evidence, the Claims Court found that there was “insufficient evidence in the record to support [the Stock Split Claims].” Starr VI, 121 Fed.Cl. at 455. It found that even though the reverse stock split “allowed] the Government to avoid a separate class vote of the common shareholders,” Starr had “presented little evidence showing that the idea for the exchange preceded the reverse stock split” and was designed to avoid such a vote. Id. at 455-56. Instead, the court held, the “primary purpose” of the reverse stock split was to avoid a delisting on the NYSE. Id. at 456. It noted that “[e]very witness at trial testified unequivocally that Starr and AIG’s other shareholders voted” in favor of the reverse stock split in order to avoid NYSE delisting. Id. at 455.
We agree with the Government that the trial court did not clearly err in finding that the reverse stock split was not a' vehicle designed by the Government to obtain AIG common stock. For example, there is no dispute that the Government could have converted a substantial amount of its preferred stock into common stock even without the reverse stock split, and common shareholders, including Starr itself, voted in favor of the reverse stock split. The record also shows that the proxy statement expressly stated that the reverse stock split was aimed at avoiding NYSE delisting. And more reliably, the Government waited well over a year after the reverse stock split to convert its preferred shares — a gap in time that makes it less likely that the reverse stock split was planned to take away shareholder interests. Even if the evidence could have led a trier of fact to a different conclusion, Starr has not persuaded us that the trial court clearly erred.[26] See, e.g., Fraser Constr. Co. v. United States, 384 F.3d 1354, 1364 (Fed. Cir. 2004) (upholding factual findings under dear-error review even though “a trier of fact could have made a different finding”).
As Starr recognizes, the reverse stock split itself was permissible under Delaware law. See 8 Del. C. § 242(b)(2) (specifying when a separate class vote is required). Viewing the whole record, the Claims Court did not commit reversible error in *975 denying relief for the Stock Split Claims. We affirm that portion of the Claims Court’s judgment.
III. Conclusion
For the foregoing reasons, we vacate the Claims Court’s holdings on the merits of the illegal exaction claim, remand with instructions for dismissal of the Equity Claims, and affirm the denial of relief with respect to the Stock Split Claims. After disposing of these issues, we conclude that any remaining issues on appeal and cross-appeal are moot.
VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED
Costs
Costs awarded to the United States.

. The facts relied upon herein are not in material dispute unless otherwise noted. We do not reach or endorse any other factual findings made by the Claims Court.

. The FRBNY is one of twelve Federal Reserve Banks in the Federal Reserve System and is a "fiscal agent[] of the United States,” 12 U.S.C. § 391; see also Starr Int’l Co. v. Fed. Reserve Bank of N.Y., 742 F.3d 37, 40 (2d Cir. 2014) (internal quotation marks omitted) (referring to Federal Reserve Banks as "instru-mentalities of the federal government”). The Board of Governors of the Federal Reserve System ("Federal Reserve Board”) is composed of seven Presidential appointees who are confirmed by the Senate. 12 U.S.C. § 241.

. Section 13(3) of the Federal Reserve Act was subsequently amended in 2010. See Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Because the events giving rise to Starr's claims occurred around 2008-2009, we refer to the version of the statute in force at that time. We note, however, that the 2010 amendments, as well as other legislation by Congress, imposed certain reporting requirements on the Federal Reserve Board with respect to § 13(3) of the Act. See 124 Stat. at 2114-15 (requiring the Federal Reserve Board to report "the amount of interest, fees, and other revenue or items of value received in exchange for [§ 13(3)] assistance”); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 *959 Stat. 3765, 3796-97 (requiring the Federal Reserve Board to disclose any exercise of § 13(3) loan authority, including the “recipient of warrants or any other potential equity in exchange for [§ 13(3) ] loan[s],” to Congress within seven days).

. Starr asserted, and the trial court found, that until the Credit Agreement of September 22, 2008, “no legally binding agreement existed between AIG and [the] FRBNY entitling the Government to an equity interest” in AIG. Starr Int’l Co. v. United States (“Starr VI”), 121 Fed.Cl. 428, 445 (2015); see also id. at 472 (same). We do not disturb that finding for purposes of this appeal.

. After the initial $85 billion loan, the Federal Reserve provided AIG with other financial assistance that is not at issue in this appeal.

. Starr concurrently filed suit against the FRBNY in the U.S. District Court for the Southern District of New York, alleging breaches of fiduciary duty related to the § 13(3) loan and the FRBNY’s subsequent actions. The district court dismissed all of those claims, and the U.S. Court of Appeals for the Second Circuit affirmed. See Starr, 906 F.Supp.2d 202 (S.D.N.Y. 2012), aff'd, 742 F.3d 37 (2d Cir. 2014).

. More than 274,000 AIG shareholders opted into these classes under RCFC 23.

. Under Delaware law, a shareholder’s right to proceed with a derivative action "is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation.” Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993). "[B]y promoting [a] form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.” Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

. The Supreme Court has called the unconstitutional conditions doctrine "an overarching principle[ ] ... that vindicates the Constitution’s enumerated rights by preventing the government from coercing people into giving them up” where it could withhold a benefit otherwise. Koontz v. St. Johns River Water Mgmt. Dist., — U.S. —, 133 S.Ct. 2586, 2594, 186 L.Ed.2d 697 (2013). The Government contends that Starr invokes the unconstitutional conditions doctrine as a theory underlying a Fifth Amendment takings claim. Starr does not dispute that characterization and, indeed, refers to its “takings claim based on the imposition of an unconstitutional condition.” Appellant’s Opening Br. 30; see also id. at 54 (arguing that the unconstitutional "condition resulted in a violation of the shareholders' right to just compensation”). As a matter of convenience to distinguish Starr’s claim based on the unconstitutional conditions doctrine from any other takings claim, *962 we refer to the former as Starr's "unconstitutional conditions claim.”

. For simplicity, we refer to Starr as the Appellant, even though it is also the Cross-Appellee.

. The Claims Court also dismissed under RCFC 12(b)(1) and RCFC 12(b)(6) other claims that Starr had brought regarding the Government’s acquisition of equity. Starr II, 106 Fed.Cl. at 83. The dismissal of those other claims is not at issue in this appeal.

. In view of its holding that the Government's acquisition of equity was an illegal exaction in violation of § 13(3) of the Federal Reserve Act, the trial court did not reach the *963 merits of any remaining takings claim, Starr VI, 121 Fed.Cl. at 472.

. Starr does not separately argue on appeal the merits of any takings claims, which the Claims Court did not reach. Oral Argument 56:42-57:25, available at http:// oralarguments.cafc.uscourts.gov/mp3/2015-5103,mp3. It seeks a remand for further proceedings on the takings claims if we were to hold that there was no illegal exaction.

. The Government has not pressed the issue of subject matter jurisdiction on appeal. The Concurrence would nonetheless hold that the Claims Court lacked subject matter jurisdiction over the illegal exaction claims, in part because § 13(3) of the Act supposedly does not prohibit the Government from taking equity in a private entity. Concurrence at 957-67. We need not reach those issues to resolve this case. "[T]he prudential standing doctrine[ ] represents the sort of ‘threshold question’ [the Supreme Court] ha[s] recognized may be resolved before addressing jurisdiction.” Tenet v. Doe, 544 U.S. 1, 6 n.4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005); see also Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (“It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."). We see no need to take up the mantle for the Government on the alternate ground of subject matter jurisdiction — a ground that even the Concurrence believes does not resolve all of the Equity Claims — when the standing issue resolves all of the Equity Claims.

. The Government does not contest Starr’s standing to pursue direct relief for the Stock *964 Split Claims because there is no dispute that at the time of the alleged injury underlying those claims, the Government had become a majority controlling shareholder and allegedly benefited by depriving minority shareholders of their interests. Oral Argument 54:02-55:57. We, too, are satisfied that Starr has direct standing to sue on the Stock Split Claims,

. On constitutional standing, the Concurrence would hold that Starr's injury was not a particularized grievance on the sole basis that AIG shareholders acknowledged being affected “ 'on a ratable basis, share for share,’" Concurrence at 970 (quoting J.A. 501694). But this case does not present a generalized grievance where the effect is "undifferentiated and common to all members of the public.” United States v. Richardson, 418 U.S. 166, 177, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (internal quotation marks omitted). Whether an injury is particularized, as opposed to generalized, does not hinge on the number of people affected or the fact that they may be similarly affected, as even "widely shared” injuries can be "particularized.” Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1548 n.7, 194 L.Ed.2d 635 (2016); see also Fed. Election Comm’n v. Akins, 524 U.S. 11, 35, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (Scalia, J., dissenting) ("[I]t is a gross oversimplification” to dismiss "widely shared” injuries for lack of a particularized injury because "each individual” may still “suffer[] a particularized and differentiated harm."); Lujan, 504 U.S. at 572, 112 S.Ct. 2130 (distinguishing a generalized grievance from "a case where concrete injury has been suffered by many persons as in mass fraud or mass tort situations"). Here, each AIG shareholder was affected in a proportional measure and in a way distinguishable from the rest of the public. The Concurrence further suggests that Starr may not have suffered any actual, concrete injury, by embracing the view that *965 Starr’s shares would have been “valueless” absent any Government intervention whatsoever. Concurrence at 990 n.9. But the question of how much Starr’s shares would have been worth absent the dilution caused by the Government’s equity acquisition is an issue that the parties fervently dispute on appeal. Without reaching the merits of that dispute, we note the oddity of saying that the dilution of a stockholder’s corporate ownership interests does not actually and concretely injure that stockholder.

. The Supreme Court has, in certain circumstances, been “forgiving" of the limitation against third-party standing, Kowalski, 543 U.S. at 130, 125 S.Ct. 564 (collecting cases), but not in the context of the distinction between derivative and direct shareholder actions. Starr does not argue that the distinction should be relaxed here. We also recognize that prudential objectives may be overcome where "deference to [the third-party right-holder] can serve no functional purpose.” Craig v. Boren, 429 U.S. 190, 193-94, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Starr has not made that argument either. The Claims Court stated that it proceeded to trial, in part, to develop a full record regarding direct standing but never returned to that issue after trial. See Starr V, 112 Fed.Cl. at 605-06; Starr VI, 121 Fed.Cl. at 463. And the third-party right-holder, AIG, is easily identifiable and is in the sole position under principles of corporate law to decide whether or not to assert claims that belong to it. We therefore observe that the prudential limitation maintains an important function in this case.

. The Supreme Court recently shed the “prudential” label for certain other requirements of standing but did not expressly do so for the principle of third-party standing. Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 1387 & n.3, 188 L.Ed.2d 392 (2014).

. As noted above, the Delaware Supreme Court has renounced distinguishing between derivative and direct actions by merely asking whether all shareholders were affected. See Tooley, 845 A.2d at 1037 (calling that concept "confusing and inaccurate”). It recognizes, though, that where a "dilution in value of the corporation’s stock is merely the unavoidable result ... of the reduction in value of the entire corporate entity,” a claim is "not normally regarded as direct.” Rossette, 906 A.2d at 99. Delaware law is not inconsistent with Alleghany.

. The Government also supposedly avoided a $30 billion strike price payment by obtaining AIG equity in the form of preferred stock rather than warrants. Starr VI, 121 Fed.Cl. at 446. To the extent the Government obtained that equity for too little compensation, that harm, as we have explained, gives rise to an overpayment claim that would belong to AIG under Delaware law. See Rossette, 906 A.2d at 99.

. Starr's damages theory appears to undermine its allegation of a more narrow injury based on a specific voting right. Its damages theory before the trial court was consistently tied to the “market value of the [AIG stock],” J.A. 50048, not to any value representing a discrete voting right.

. We also question whether Starr has sufficiently alleged an injury-in-fact with respect to the loss of a collective majority interest. Starr has not pointed to any competent evidence that the Credit Agreement Class was so unified that it held a majority voting block that would have undermined the Government’s ability to exercise any warrants to obtain preferred stock. This alleged harm, in other words, appears too speculative to give rise to standing.

. The Government asserts that loan terms could be said to be "punitive” against shareholders without actually being intended to directly punish the shareholders. It points, for example, to the testimony of then-Secretary of the Treasury, Henry Paulson, who said: “[The equity term of the loan] did indeed punish the shareholders. I didn’t mean that in a vindictive way.... That’s just the way our system is supposed to work, that when companies fail, the shareholders bear the losses.” J.A. 101243-44.

. The only reference in the trial court's post-trial opinion to any punitive effect on AIG’s shareholders was the observation that one of Starr’s experts had testified that the loan terms were punitive and imposed "on AIG’s shareholders.” Starr VI, 121 Fed.Cl. at 460-61. This reference appears in the trial court’s summary of the record, not in its factual findings.

. In view of our decision that Starr lacks direct standing to pursue the Equity Claims, there is no need for further proceedings on remand regarding the merits of those claims.

. Starr also argues that the trial court failed to consider that "the Government was able to benefit from the reverse stock split only because it was able to delay and control that vote with the preferred stock it illegally acquired as a result of the Credit Agreement.” Appellant’s Opening Br. 60. That argument is moot in view of our decision today vacating the determination that the Government’s acquisition of equity was illegal.