# United States Court of Appeals for the Federal Circuit

_____

**MODA HEALTH PLAN, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

_____

2017-1994

_____

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00649-TCW, Judge Thomas C. Wheeler.

_____

Decided: June 14, 2018

_____

STEVEN ROSENBAUM, Covington & Burling LLP, Washington, DC, argued for plaintiff-appellee. Also represented by SHRUTI CHAGANTI BARKER, CAROLINE BROWN, PHILIP PEISCH.

ALISA BETH KLEIN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by CHAD A. READLER, MARK B. STERN.

THOMAS G. HUNGAR, Office of General Counsel, United States House of Representatives, Washington, DC, for amicus curiae United States House of Representatives. Also represented by KIMBERLY HAMM, TODD B. TATELMAN.

WILLIAM LEWIS ROBERTS, Faegre Baker Daniels LLP, Minneapolis, MN, for amicus curiae Association for Community Affiliated Plans. Also represented by JONATHAN WILLIAM DETTMANN, KELLY J. FERMOYLE, NICHOLAS JAMES NELSON.

STEVEN ALLEN NEELEY, JR., Husch Blackwell LLP, Washington, DC, for amicus curiae National Association of Insurance Commissioners.

STEPHEN A. SWEDLOW, Quinn Emanuel Urquhart & Sullivan, LLP, Chicago, IL, for amicus curiae Health Republic Insurance Company.

URSULA TAYLOR, Butler Rubin Saltarelli & Boyd LLP, Chicago, IL, for amicus curiae Blue Cross Blue Shield Association. Also represented by SANDRA J. DURKIN.

BENJAMIN N. GUTMAN, Oregon Department of Justice, Salem, OR, for amici curiae State of Oregon, State of Alaska, State of Connecticut, State of Hawaii, State of Illinois, State of Iowa, State of Maryland, State of Massachusetts, State of Minnesota, State of New Mexico, State of North Carolina, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Virginia, State of Washington, State of Wyoming, District of Columbia.

---

Before PROST, *Chief Judge,* NEWMAN and MOORE, *Circuit Judges.*

Opinion for the court filed by *Chief Judge* PROST.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

PROST, *Chief Judge*.

A health insurer contends that the government failed to satisfy the full amount of its payment obligation under a program designed to alleviate the risk of offering coverage to an expanded pool of individuals. The Court of Federal Claims entered judgment for the insurer on both statutory and contract grounds. The government appeals. We reverse.

## BACKGROUND

This case concerns a three-year "risk corridors" program described in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified at 42 U.S.C. §§ 18001 et seq.) ("ACA"), and implemented by regulations promulgated by the U.S. Department of Health and Human Services ("HHS"). The case also concerns the bills that appropriated funds to HHS and the Centers for Medicare & Medicaid Services ("CMS") within HHS for the fiscal years during which the program in question operated. We begin with the ACA.

## I.   The ACA

Among other reforms, the ACA established "health benefit exchanges"—virtual marketplaces in each state wherein individuals and small groups could purchase health coverage. 42 U.S.C. § 18031(b)(1). The new exchanges offered centralized opportunities for insurers to compete for new customers. The ACA required that all plans offered in the exchanges satisfy certain criteria, including providing certain "essential" benefits. *See* 42 U.S.C. §§ 18021, 18031(c).

Because insurers lacked reliable data to estimate the cost of providing care for the expanded pool of individuals seeking coverage via the new exchanges, insurers faced significant risk if they elected to offer plans in these

exchanges. The ACA established three programs de-
signed to mitigate that risk and discourage insurers from
setting higher premiums to offset that risk: reinsurance,
risk adjustment, and risk corridors. 42 U.S.C. §§ 18061–
63. This case concerns the risk corridors program.

Section 1342 of the ACA directed the Secretary of
HHS to establish a risk corridors program for calendar
years 2014–2016. The full text of Section 1342 is repro-
duced below:

(a) In general

The Secretary shall establish and administer a
program of risk corridors for calendar years 2014,
2015, and 2016 under which a qualified health
plan offered in the individual or small group mar-
ket shall participate in a payment adjustment
system based on the ratio of the allowable costs of
the plan to the plan's aggregate premiums. Such
program shall be based on the program for re-
gional participating provider organizations under
part D of title XVIII of the Social Security Act [42
U.S.C. §§ 1395w-101 et seq.].

(b) Payment methodology

(1) Payments out

The Secretary shall provide under the pro-
gram established under subsection (a) that
if—

(A) a participating plan's allowable costs
for any plan year are more than 103 per-
cent but not more than 108 percent of the
target amount, the Secretary shall pay to
the plan an amount equal to 50 percent of
the target amount in excess of 103 percent
of the target amount; and

(B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(2) Payments in

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the excess of 92 percent of the target amount over the allowable costs.

(c) Definitions

In this section:

(1) Allowable costs

(A) In general

The amount of allowable costs of a plan for any year is an amount equal to the total costs (other than administrative costs) of

the plan in providing benefits covered by the plan.

(B) Reduction for risk adjustment and reinsurance payments

Allowable costs shall [be] reduced by any risk adjustment and reinsurance payments received under section[s] 18061 and 18063 of this title.

(2) Target amount

The target amount of a plan for any year is an amount equal to the total premiums (including any premium subsidies under any governmental program), reduced by the administrative costs of the plan.

42 U.S.C. § 18062.

Briefly, section 1342 directed the Secretary of HHS to establish a program whereby participating plans whose costs of providing coverage exceeded the premiums received (as determined by a statutory formula) would be paid a share of their excess costs by the Secretary— "payments out." Conversely, participating plans whose premiums exceeded their costs (according to the same formula) would pay a share of their profits to the Secretary—"payments in." The risk corridors program "permit[ted] issuers to lower [premiums] by not adding a risk premium to account for perceived uncertainties in the 2014 through 2016 markets." HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,413 (Mar. 11, 2013).

On March 20, 2010, just three days before Congress passed the ACA, the Congressional Budget Office ("CBO") published an estimate of the ACA's cost. *See* Letter from Douglas Elmendorf, Director, CBO, to Nancy Pelosi, Speaker, House of Representatives tbl. 2 (Mar. 20, 2010)

("CBO Cost Estimate"), https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/costestimate/amendreconprop.pdf. The CBO Cost Estimate made no mention of the risk corridors program, though it scored the reinsurance and risk adjustment programs. *Id.* Overall, CBO predicted the ACA would reduce the federal deficit by $143 billion over the 2010–2019 period it evaluated. *Id.* at p.2.

Preambulatory language in the ACA referred to CBO's overall scoring, noting that the "Act will reduce the Federal deficit between 2010 and 2019." ACA § 1563(a).

## II. Implementing Regulations

In March 2012, HHS promulgated regulations establishing the risk corridors program as directed by section 1342. Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. 17,220, 17,251–52 (Mar. 23, 2012) (codified at 45 C.F.R. Pt. 153, Subpart F). Those regulations defined terms such as "allowable costs," "administrative costs," "premiums earned," and "target amount," all of which would ultimately factor into the calculations of payments in and payments out required by the statutory formula. *E.g.*, *id.* at 17,236–39.

The regulations also provided that insurers offering qualified health plans in the exchanges "will receive payment from HHS in the following amounts, under the following circumstances" and it recited the same formula set forth in the statute for payments out. 45 C.F.R. § 153.510(b). The regulations similarly provided that insurers "must remit charges to HHS" according to the statutory formula for payments in. *Id.* § 153.510(c).

In March 2013, after an informal rulemaking proceeding, HHS published parameters for payments under various ACA programs for the first year of the exchanges, 2014, including the risk corridors program. The parameters revised certain definitions and added others, notably

incorporating a certain level of profits as part of the allowable administrative costs. 78 Fed. Reg. at 15,530–31 (codified at 45 C.F.R. § 153.530). The parameters also provided that an issuer of a plan in an exchange must submit all information required for calculating risk corridors payments by July 31 of the year following the benefit year. *Id.* HHS also indicated that "the risk corridors program is not required to be budget neutral," so HHS would make full payments "as required under Section 1342 of the Affordable Care Act." 78 Fed. Reg. at 15,473. This constituted the final word from HHS on the risk corridors program before the exchanges opened and the program began.

## III. Transitional Policy

The ACA established several reforms for insurance plans—such as requiring a minimum level of coverage—scheduled to take effect on January 1, 2014. ACA § 1255. Non-compliant plans in effect prior to the passage of the ACA in 2010, however, received a statutory exemption from certain requirements. 42 U.S.C. § 18011. This meant that insurers expected the pool of participants in the exchanges to include both previously uninsured individuals as well as individuals whose previous coverage terminated because their respective plans did not comply with the ACA and did not qualify for the grandfathering exemption.

Individuals and small businesses enrolled in non-compliant plans not qualifying for the exemption received notice that their plans would be terminated. Many expressed concern that new coverage would be "more expensive than their current coverage, and thus they may be dissuaded from immediately transitioning to such coverage." J.A. 429. In November 2013, after appellee Moda Health Plan, Inc. and other insurers had already set premiums for the exchanges for 2014, HHS announced a one-year transitional policy that allowed insurers to

continue to offer plans that did not comply with certain of the ACA's reforms even for non-grandfathered plans. J.A. 429–31. HHS directed state agencies to adopt the same policies. J.A. 431.

This dampened ACA enrollment in states implementing the policy, especially by healthier individuals who elected to maintain their lower level of coverage, leaving insurers participating in the exchanges to bear greater risk than they accounted for in setting premiums. *See* Milliman, A Financial Post-Mortem: Transitional Policies and the Financial Implications for the 2014 Individual Market 1 (July 2016) ("Our analysis indicates that issuers in states that implemented the transitional policy generally have higher medical loss ratios in the individual market."), http://www.milliman.com/uploadedFiles/insight/2016/2263HDP_20160712(1).pdf.

HHS acknowledged that "this transitional policy was not anticipated by health insurance issuers when setting rates for 2014" but noted "the risk corridor program should help ameliorate unanticipated changes in premium revenue." *Id.* HHS later extended the transitional period to last the duration of the risk corridor program. J.A. 448–62.

After further informal rulemaking (begun soon after announcing the transitional policy), HHS informed insurers that it would adjust the operation of the risk corridors program for the 2014 benefit year to "offset losses that might occur under the transitional policy as a result of increased claims costs not accounted for when setting 2014 premiums." *HHS Notice of Benefit and Payment Parameters for 2015*, 79 Fed. Reg. 13,744, 13,786–87 (Mar. 11, 2014). This included adjustments to HHS's formula for calculating the "allowable costs" and "target amount" involved in the statutory formula. *Id.*

HHS projected that these new changes (together with changes to the reinsurance program) would "result in net

payments that are budget neutral in 2014" and that it "intend[ed] to implement this program in a budget neutral manner" with adjustments over time with that goal in mind. *Id.* at 13,787.

In April 2014, CMS, the division of HHS responsible for administering the risk corridors program, released guidance regarding "Risk Corridors and Budget Neutrality." J.A. 229–30. It explained a new budget neutrality policy as follows:

> We anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments. However, if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments. If, after the obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall. If any risk corridors funds remain after prior and current year payment obligations have been met, they will be held to offset potential insufficiencies in risk corridors collections in the next year.

J.A. 229.

As to any shortfall in the final year of payment, CMS stated it anticipated payments in would be sufficient, but that future guidance or rulemaking would address any persistent shortfalls. J.A. 230.

## IV. Appropriations

In February 2014, after HHS had proposed its adjustments to account for the transitional policy (but before HHS had finalized the adjustments), Congress asked the Government Accountability Office ("GAO") to determine what sources of funds could be used to make any payments in execution of the risk corridors program. *See* Dep't of Health & Human Servs.—Risk Corridors Program ("GAO Report"), B-325630, 2014 WL 4825237, at *1 (Comp. Gen. Sept. 30, 2014) (noting request). GAO responded that it had identified two potential sources of funding in the appropriations for "Program Management" for CMS in FY 2014. That appropriation included a lump sum in excess of three billion dollars for carrying out certain responsibilities, including "other responsibilities" of CMS as well as "such sums as may be collected from authorized user fees." *Id.* at *3 (citing Pub. L. No. 113-76, div. H, title II, 128 Stat. 5, 374 (Jan. 17, 2014)).

GAO concluded that the "other responsibilities" language in the CMS Program Management appropriation for FY 2014 could encompass payments to health plans under the risk corridors program, and so the lump-sum appropriation "would have been available for making payments pursuant to section 1342(b)(1)." *Id.* Further, GAO concluded that the payments in from the risk corridors program constituted "user fees," and so "any amounts collected in FY 2014 pursuant to section 1342(b)(2) would have been available . . . for making the payments pursuant to section 1342(b)(2)," though HHS had not planned to make any such collections or payments until FY 2015. *Id.* at *5 & n.7.

GAO clarified that appropriations acts "are considered nonpermanent legislation," so the language it analyzed regarding the lump-sum appropriation and user fees "would need to be included in the CMS PM appropriation

for FY 2015" in order to be available to make any risk corridors payments in FY 2015. *Id.*

In December 2014, Congress passed its appropriations to HHS for FY 2015 (during which the first benefit year covered by the risk corridors program would conclude). That legislation reenacted the user fee language that GAO had analyzed and provided a lump sum for CMS's Program Management account; however, the lump-sum appropriation included a rider providing:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the 'Centers for Medicare and Medicaid Services—Program Management' account, may be used for payments under Section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. G, title II, § 227, 128 Stat. 2130, 2491.

Representative Harold Rogers, then-Chairman of the House Committee on Appropriations, explained his view of the appropriations rider upon its inclusion in the appropriations bill for FY 2015:

> In 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral, meaning that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect. The agreement includes new bill language to prevent CMS Program Management appropriation account from being used to support risk corridors payments.

160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).

Congress enacted identical riders in FY 2016 and FY 2017. Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, § 225, 129 Stat. 2242, 2624; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. H, title II, § 223, 131 Stat. 135, 543.[1]

## V.  Subsequent Agency Action

In September 2015, CMS announced that the total amount of payments in fell short of the total amount requested in payments out. Specifically, it expected payments in of approximately $362 million but noted requests for payments out totaling $2.87 billion. J.A. 244. Accordingly, CMS planned to issue prorated payments at a rate of 12.6 percent, with any shortfall to be made up by the payments in received following the 2015 benefit year. *Id.*

A follow-up letter noted that HHS would "explore other sources of funding for risk corridors payments, subject to the availability of appropriations" in the event of a shortfall following the final year of the program. J.A. 245.

A report from CMS shows that the total amount of payments in collected for the 2014–2016 benefit years fell short of the total amount of payments out calculated according to the agency's formula by more than $12 billion. CMS, Risk Corridors Payment and Charge Amounts for the 2016 Benefit Year (November 2017), https://www.cms.gov/CCIIO/Programs-and-Initiatives/ Premium-Stabilization-Programs/Downloads/Risk- Corridors-Amounts-2016.pdf.

---

[1]    Continuing resolutions in advance of the 2017 appropriations retained the same restrictions on funds. Continuing Appropriations Act, 2017, Pub. L. No. 114-223, div. C, §§ 103–04, 130 Stat. 857, 908–09; Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. No. 114-254, § 101, 130 Stat. 1005, 1005–06.

## VI. Procedural History

Moda commenced this action in the Court of Federal Claims under the Tucker Act in July 2016. It seeks the balance between the prorated payments it received and the full amount of payments out according to section 1342. The Court of Federal Claims denied the government's motion to dismiss for lack of jurisdiction and for failure to state a claim and granted Moda's cross-motion for partial summary judgment as to liability.

Both sides stipulated that the government owed Moda $209,830,445.79 in accordance with the ruling on liability. J.A. 41. The trial court entered judgment for Moda accordingly. J.A. 45.

Dozens of other insurers filed actions alleging similar claims, with mixed results from the Court of Federal Claims. *See, e.g.*, *Molina Healthcare of Cal., Inc. v. United States*, 133 Fed. Cl. 14 (2017) (ruling for the insurer); *Me. Cmty. Health Options v. United States*, 133 Fed. Cl. 1 (2017) (ruling for the government).

The Court of Federal Claims had jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1).[2] We have jurisdiction under 28 U.S.C. § 1295(a)(3).

---

[2]    The government does not appeal the Court of Federal Claims' determination of Tucker Act jurisdiction, and it appears to concede that section 1342 is money-mandating for jurisdictional purposes (though not on the merits). Appellant's Reply Br. 11. As discussed below, we hold that section 1342 initially created an obligation to pay the full amount of payments out. We also agree with the Court of Federal Claims that the statute is money-mandating for jurisdictional purposes. *See Greenlee Cty. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007) (concluding a statute is money-mandating for jurisdictional

DISCUSSION

Moda advances claims based on two theories. First, Moda contends that section 1342 itself obligates the government to pay insurers the full amount indicated by the statutory formula for payments out, notwithstanding the amount of payments in collected. Second, Moda contends that HHS made a contractual agreement to pay the full amount required by the statute in exchange for Moda's performance (by offering a compliant plan in an exchange), and the government breached that agreement by failing to pay the full amount according to the statutory formula for payments out.

We review the Court of Federal Claims' legal conclusion that the government was liable on both theories de novo. *See Starr Int'l Co. v. United States*, 856 F.3d 953, 963 (Fed. Cir. 2017).

## I. Statutory Claim

Moda argues that section 1342 obligated the government to pay the full amount indicated by the statutory formula for payments out, not a pro rata sum of the payments in. The government responds that section 1342 itself contemplated operating the risk corridors program in a budget neutral manner (so the total amount of payments out due to insurers cannot exceed the amount of payments in). In the alternative, the government contends that appropriations riders on the fiscal years in which payments from the risk corridors program came due limited the government's obligation to the amount of payments in. Although we agree with Moda that section 1342 obligated the government to pay the full amount of

---

purposes if it "can fairly be interpreted" to require payment of damages, or if it is "reasonably amenable" to such a reading, which does not require the plaintiff to have a successful claim on the merits).

risk corridors payments according to the formula it set forth, we hold that the riders on the relevant appropriations effected a suspension of that obligation for each of the relevant years.

We begin with the statute.

### A. Statutory Interpretation

The government asserts that Congress designed section 1342 to be budget neutral, funded solely through payments in and that the statute carries no obligation to make payments at the full amount indicated by the statutory formula if payments in fell short.

Section 1342 is unambiguously mandatory. It provides that "[t]he Secretary *shall* establish and administer" a risk corridors program pursuant to which "[t]he Secretary *shall* provide" under the program that "the Secretary *shall* pay" an amount according to a statutory formula. 42 U.S.C. § 18062 (emphases added). Nothing in section 1342 indicates that the payment methodology is somehow limited by payments in. It simply sets forth a formula for calculating payment amounts based on a percentage of a "target amount" of allowable costs.

The government reasons that we must nevertheless interpret section 1342 to be budget neutral, because Congress relied on the CBO Cost Estimate that the ACA would decrease the federal deficit between 2010 and 2019, without evaluating the budgetary effect of the risk corridors program. Thus, according to the government, the ACA's passage rested on an understanding that the risk corridors program would be budget neutral.

Nothing in the CBO Cost Estimate indicates that it viewed the risk corridors program as budget neutral. Indeed, even if CBO had accurately predicted the $12.3 billion shortfall that now exists, CBO's overall estimate that the ACA would reduce the federal deficit would have

remained true, since CBO had estimated a reduction of more than $100 billion. *See* CBO Cost Estimate at 2.

The government's amicus suggests it is "inconceivable" that CBO would have declined to analyze the budgetary impact of the risk corridors program, given its obligation to prepare "an estimate of the costs which would be incurred in carrying out such bill." Br. of Amicus Curiae U.S. House Rep. in Supp. of Appellant at 7 (quoting 2 U.S.C. § 653). Not so. It is entirely plausible that CBO expected payments in would roughly equal payments out over the three year program, especially since CBO could not have predicted the costly impact of HHS's transitional policy, which had not been contemplated at that time. Without more, CBO's omission of the risk corridors program from its report can be viewed as nothing more than a bare failure to speak. Moreover, even if CBO interpreted the statute to require budget neutrality, that interpretation warrants no deference, especially in light of HHS's subsequent interpretation to the contrary. CBO's silence simply cannot displace the plain meaning of the text of section 1342.

The government also argues that section 1342 created no obligation to make payments out in excess of payments in because it provided no budgetary authority to the Secretary of HHS and identified no source of funds for any payment obligations beyond payments in. But it has long been the law that the government may incur a debt independent of an appropriation to satisfy that debt, at least in certain circumstances.

In *United States v. Langston*, 118 U.S. 389 (1886), Congress appropriated only five thousand dollars for the salary of a foreign minister, though a statute provided that the official's salary would be seven thousand five hundred dollars. The Supreme Court held that the statute fixing the official's salary could not be "abrogated or suspended by the subsequent enactments which merely

appropriated a less amount" for the services rendered, absent "words that expressly, or by clear implication, modified or repealed the previous law." *Id.* at 393. That is, the government's statutory obligation to pay persisted independent of the appropriation of funds to satisfy that obligation.

Our predecessor court noted long ago that "[a]n appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892); *see N.Y. Airways, Inc. v. United States*, 369 F.2d 743, 748 (Ct. Cl. 1966) ("It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute.").

It is also of no moment that, as the government notes, HHS could not have made payments out to insurers in an amount totaling more than the amount of payments in without running afoul of the Anti-Deficiency Act. That Act provides that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure . . . exceeding an amount available in an appropriation . . . for the expenditure." 31 U.S.C. § 1341(a)(1)(A). But the Supreme Court has rejected the notion that the Anti-Deficiency Act's requirements somehow defeat the obligations of the government. *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012). The Anti-Deficiency Act simply constrains government officials. *Id.*

For the same reason, it is immaterial that Congress provided that the risk corridors program established by section 1342 would be "based on the program" establish-

ing risk corridors in Medicare Part D yet declined to provide "budget authority in advance of appropriations acts," as in the corresponding Medicare statute. *See* 42 U.S.C. § 1395w-115.[3] Budget authority is not *necessary* to create an obligation of the government; it is a means by which an officer is afforded that authority. *See* 2 U.S.C. § 622(2).

Here, the obligation is created by the statute itself, not by the agency. The government cites no authority for its contention that a statutory obligation cannot exist absent budget authority. Such a rule would be inconsistent with *Langston*, where the obligation existed independent of any budget authority and independent of a sufficient appropriation to meet the obligation.

We conclude that the plain language of section 1342 created an obligation of the government to pay participants in the health benefit exchanges the full amount indicated by the statutory formula for payments out under the risk corridors program. We next consider whether, notwithstanding that statutory requirement, Congress has suspended or repealed that obligation.

---

[3]    The fact that the same provision also "represents the obligation of the Secretary to provide for the payment of amounts provided under this section" cuts both ways. 42 U.S.C. § 1395w-115. Although Congress never expressly stated that section 1342 represented an obligation of the Secretary, it used unambiguous mandatory language that in fact set forth such an obligation, especially in light of Congress's intent to make the risk corridors program in the ACA "based on" Medicare's obligatory program. The government offers no basis for concluding that stating the "obligation of the Secretary" outright is the sine qua non of finding an obligation here. The plain language of the statute controls.

B.  The Effect of the Appropriations Riders

The government next argues the riders in the appropriations bills for FY 2015 and FY 2016 repealed or suspended its obligation to make payments out in an aggregate amount exceeding payments in.[4]  We agree.

Repeals by implication are generally disfavored, but "when Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that . . . it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.'"  *United States v. Will*, 449 U.S. 200, 221–22 (1980) (quoting *United States v. Dickerson*, 310 U.S. 554, 555 (1940)).  Whether an appropriations bill impliedly suspends or repeals substantive law "depends on the intention of [C]ongress as expressed in the statutes." *United States v. Mitchell*, 109 U.S. 146, 150 (1883).  The central issue on Moda's statutory claim, therefore, is whether the appropriations riders adequately expressed Congress's intent to suspend payments on the risk corridors program beyond the sum of payments in.  We conclude the answer is yes.

Moda contends, however, this issue is also controlled by *Langston*.  There, as discussed above, the Supreme Court held that a bare failure to appropriate funds to meet a statutory obligation could not vitiate that obligation because it carried no implication of Congress's intent to amend or suspend the substantive law at issue.  *Langston*, 118 U.S. at 394.

Just three years before *Langston*, however, the Supreme Court held that a statute that had set the salaries of certain interpreters at a fixed sum "in full of all emoluments whatsoever" had been impliedly amended, where

---

[4]   The government's argument applies equally to FY 2017, though that appropriations bill had not yet been enacted before this case completed briefing.

Congress appropriated funds less than the fixed sum set by statute, with a separate sum set aside for additional compensation at the discretion of the Secretary of the Interior. *Mitchell*, 109 U.S. at 149. The Court held:

> This course of legislation . . . distinctly reveal[ed] a change in the policy of [C]ongress on the subject, namely that instead of establishing a salary for interpreters at a fixed amount, and cutting off all other emoluments and allowances, [C]ongress intended to reduce the salaries and place a fund at the disposal of the [S]ecretary of the [I]nterior, from which, at his discretion, additional emoluments and allowances might be given to the interpreters.

*Id.* at 149–50. Thus, "for the time covered by those" appropriations bills, the intent of Congress was "plain on the face of the statute." *Id.* at 150.

*Langston* expressly distinguished *Mitchell* because the appropriations bills in *Mitchell* implied "that [C]ongress intended to repeal the act" setting a fixed salary, with "additional pay" to be provided at the Secretary's discretion. *Langston*, 118 U.S. at 393. By contrast, Congress had "merely appropriated a less amount" for Langston's salary. *Id.* at 394.

The question before us, then, is whether the riders on the CMS Program Management appropriations supplied the clear implication of Congress's intent to impose a new payment methodology for the time covered by the appropriations bills in question, as in *Mitchell*, or if Congress merely appropriated a less amount for the risk corridors program, as in *Langston*.

The Supreme Court has noted *Langston* "expresses the limit in that direction." *Belknap v. United States*, 150 U.S. 588, 595 (1893). The jurisprudence in the century and a half since *Langston* has cemented that decision's

place as an extreme example of a mere failure to appropriate.[5]  Our case falls clearly within the core of subsequent decisions wherein appropriations bills carried sufficient implication of repeal, amendment, or suspension of substantive law to effect that purpose, as in *Mitchell*.

In *United States v. Vulte*, 233 U.S. 509 (1914), the Supreme Court considered a series of enactments concerning bonuses for Marine Corps officers serving abroad.  A 1902 act established a ten percent bonus for all such officers and appropriated funds accordingly.  In 1906 and 1907, appropriations for the payment of that bonus carried a rider specifying that the funds could be used to pay officers serving "beyond the limits of the states comprising the Union of the territories of the United States contiguous thereto (*except P[ue]rto Rico and Hawaii*)."  *Id.* at 512–13 (emphasis added) (citations omitted).  The appropriations for 1908 contained no such rider and stated the increase of pay for officers serving abroad "shall be as now provided by law."  *Id.* at 513 (citation omitted).

An officer serving in Puerto Rico in 1908 sought compensation accounting for the ten percent bonus enacted in 1902.  The Supreme Court rejected the government's position that the exception in the appropriations bills of 1906 and 1907 impliedly repealed the 1902 act, noting that the appropriations riders lacked any "words of prospective extension" indicating a permanent change in the law.  *Id.* at 514.  Nevertheless, the Supreme Court acknowledged the appropriation riders *did* indicate Con-

---

[5]   Contrary to the suggestion of the dissent, dissent at 8, we do not discard *Langston* due to its age, rather, we simply acknowledge the extensive body of decisions since it was decided that treat it as an outer bound, consistent with the Supreme Court's view in *Belknap*.

gress's intent to "temporarily suspend as to P[ue]rto Rico and Hawaii" the ten percent bonus in 1906 and 1907. *Id.*

In *Dickerson*, the Supreme Court considered the effect of various appropriations riders on a reenlistment bonus authorized by Congress in 1922. 310 U.S. at 555–56. After several years in force, an appropriations rider expressly suspended the bonus for the fiscal years ending in 1934–1937. *Id.* at 556. The text of the rider changed in the appropriations bill for the fiscal year ending in 1938. That bill omitted the express suspension, noting only that "no part of any appropriation contained in this or any other Act for the fiscal year ending June 30, 1938, shall be available for the payment" of, inter alia, the reenlistment bonus. *Id.*

The appropriations bill for the fiscal year ending in 1939 repeated that language. *Id.* at 555. Floor debates showed that Congress intended the new language to carry the same restriction expressed in the earlier appropriations bills. *Id.* at 557–61. The Supreme Court held that the appropriations bill for the fiscal year ending in 1939 evinced Congress's intent to suspend the reenlistment bonus in light of persuasive evidence to that effect. *Id.* at 561.

Finally, in *Will*, the Supreme Court considered the effect of appropriations riders on a set of statutes establishing annual pay raises for certain officials, including federal judges. 449 U.S at 204–05 (citing 5 U.S.C. § 5505). Over a span of four years, Congress passed appropriations acts with riders limiting the use of funds to pay the increases for federal judges, among others. *See id.* at 205–09. The first such rider provided that "no part of the funds appropriated in this Act or any other Act shall be used to pay the salary of an individual in a position or office referred to in" the act providing for the pay raises for federal judges. *Id.* at 206 (quoting Legislative

Branch Appropriation Act, 1977, Pub. L. 94-440, 90 Stat. 1439, Title II).

The dispute in *Will* concerned whether the effect of the appropriations riders ran afoul of the Compensation Clause of the Constitution. Before reaching that issue, however, the Supreme Court first rejected the judges' contention that the appropriations bills did "no more than halt *funding* for the salary increases." *Id.* at 221. Acknowledging the general rule disfavoring repeals by implication and its "especial force" when the alleged repeal occurred in an appropriations bill, the Court held that in each of the four appropriations acts in question, "Congress intended to repeal or postpone previously authorized increases." *Id.* at 221–22. This was true although the riders in years 1, 3, and 4 were "phrased in terms of limiting funds." *Id.* at 223. The Court's conclusion was bolstered by floor debates occurring in year 3 of the appropriations riders as well as language expressly suspending the pay raises in year 2, but it concluded the rider in year 1 indicated that same clear intent:

> These passages indicate[d] clearly that Congress intended to rescind these rates entirely, not simply to consign them to the fiscal limbo of an account due but not payable. The clear intent of Congress in each year was to stop for that year the application of the Adjustment Act.

*Id.* at 224.

Congress clearly indicated its intent here. It asked GAO what funding would be available to make risk corridors payments, and it cut off the *sole* source of funding identified beyond payments in. It did so in each of the three years of the program's existence. And the explanatory statement regarding the amendment containing the first rider of House Appropriations Chairman Rogers confirms that the appropriations language was added with the understanding that HHS's intent to operate the

risk corridors program as a budget neutral program meant the government "will never pay out more than it collects from issuers over the three year period risk corridors are in effect." 160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014). Plainly, Congress used language similar to the appropriations riders in *Vulte*, *Dickerson*, and *Will* (and quite clearer than the language in *Mitchell*) to temporarily cap the payments required by the statute at the amount of payments in for each of the applicable years— just as those decisions altered statutory payment methodologies.[6]

What else could Congress have intended? It clearly did not intend to consign risk corridors payments "to the fiscal limbo of an account due but not payable." *See Will*, 449 U.S. at 224.

Moda contends that notwithstanding the similarities between our case and the foregoing authority, Congress simply intended to limit the use of a single source of funding while leaving others available. Moda points out that the appropriations riders in *Dickerson* and *Will* foreclosed the use of funding provided by that appropriations act "or any other act," while the riders here omit that global restriction. *Compare Dickerson*, 310 U.S. at 556, *and Will*, 449 U.S. at 206, *with* Consolidated and Further Continuing Appropriations Act, 2015, § 227, 128 Stat. at 2491. But the Supreme Court never considered the impact of that language in *Dickerson* or *Will*, and it

---

[6] We do not "ratif[y] an 'indefinite suspension' of payment," dissent at 7, or a "permanent postponement," *id.* at 16. We hold only that Congress effected a suspension applicable to the fiscal years covered by each appropriations bill containing the rider, which corresponded to each fiscal year in which risk-corridor payments came due.

found effective suspensions-by-appropriations in *Mitchell* and *Vulte* even absent that language.

Moda suggests that restricting access to funds from "any other act" was necessary to foreclose HHS from using funds that remained available. It points to the CMS Program Management appropriation for FY 2014 (before the risk corridors program began and before any appropriations riders had been enacted) as well as the Judgment Fund, a standing appropriation for the purpose of paying certain judgments against the government. We address each in turn.

In response to a request of Congress, GAO concluded that the FY 2014 CMS Program Management fund "would have been available for risk-corridors payments." *See* GAO Report at *3. According to Moda, this means HHS could have used funds from the FY 2014 appropriation to make risk corridors payments for the 2015 benefit year (which concluded in FY 2015). Not so. GAO's opinion only addressed what funds from FY 2014 would have been available for risk corridors payments had any such payments been among the "other responsibilities" of CMS *for that fiscal year*. That appropriation expired in FY 2014. *See* 128 Stat. at 5 ("The following sums in this Act are appropriated . . . for the fiscal year ending September 30, 2014."). GAO specifically noted that "for funds to be available for this purpose in FY 2015, the CMS PM appropriation for FY 2015 must include language similar to the language included in the CMS PM appropriation for FY 2015." *Id.* at *5. Of course, Congress enacted the rider for FY 2015 instead.

GAO's opinion was correct. Under section 1342, HHS could not have collected or owed payments out or payments in during FY 2014 because the statute required calculations based on allowable costs for a *plan year* and the program was to run for calendar years 2014, 2015, and 2016. Thus, HHS could not have been responsible for

payments out until, at the earliest, the end of calendar year 2014, which occurred during FY 2015.

Likewise, the CMS Program Management appropriations in the continuing resolutions enacted at the end of calendar year 2014 (during FY 2015) expired in December 2014, when Congress enacted the FY 2015 appropriations act (and the first rider in question)—still before HHS could have even calculated the payments in and payments out under the risk corridors program.

Moda's reliance on the Judgment Fund is also misplaced. The Judgment Fund is a general appropriation of "[n]ecessary amounts" in order "to pay final judgments" and other amounts owed via litigation against the government, subject to several conditions. 31 U.S.C. § 1304(a). The Judgment Fund "does not create an all-purpose fund for judicial disbursement." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 431 (1990). Rather, access to the Judgment Fund presupposes liability. Moda's contention that the government's liability persists because it could pay what it owed under the statutory scheme from the Judgment Fund reverses the inquiry. The question is what Congress intended, not what funds might be used if Congress did *not* intend to suspend payments in exceeding payments out.

As discussed above, Congress's intent to temporarily cap payments out at the amount of payments in was clear from the appropriations riders and their legislative history. It did not need to use Moda's proposed magic words, "or any other act," to foreclose resort to the Judgment Fund. We simply cannot infer, as Moda's position would require, that upon enacting the appropriations riders, Congress intended to preserve insurers' statutory entitlement to full risk corridors payments but to require insurers to pursue litigation to collect what they were entitled to. That theory cannot displace the plain implica-

tion of the language and legislative history of the appropriations riders.

Moda points out that Congress's intent regarding the appropriations riders must be understood with the context of other legislative efforts surrounding the ACA and the risk corridors program in particular. For example, Moda points to Congress's failed attempt to enact legislation requiring budget neutrality for the risk corridors program. *See, e.g.*, Obamacare Taxpayer Bailout Protection Act, S. 2214, 113th Cong. (2014). But we need not and do not conclude that Congress achieved through appropriations riders what it failed to do with permanent legislation. Rather, we only hold that Congress enacted temporary measures capping risk corridor payments out at the amount of payments in, and it did so for each year the program was in effect. (We need not address, for example, what would have occurred if Congress had failed to include the rider in one of the acts appropriating funds for the fiscal years in which payments came due or if it had affirmatively appropriated funds through some other source.)

It is also irrelevant that the President signed the bills containing the appropriations riders, even as he threatened to veto any bill rolling back the ACA, as Moda points out. *See, e.g.*, Gregory Korte, *Obama Uses Veto Pen Sparingly, But Could That Change?*, USA TODAY, Nov. 19, 2014 (noting that President Obama had threatened to veto twelve different bills that would have repealed or amended the ACA), http://www.usatoday.com/story/news/politics/2014/11/19/obama-veto-threats/19177413/. Again, we do not hold that the appropriations riders effected any permanent amendment. Moreover, Moda has offered no evidence that President Obama expressed any specific views of the implications of these appropriations riders before or after signing, much less evidence that could overcome the clear implication of the text of the riders and the surrounding legislative history.

Moda also contends that two decisions from our predecessor court, *New York Airways*, 369 F.2d at 743, and *Gibney v. United States*, 114 Ct. Cl. 38 (1949), demonstrate that the appropriations riders here do not carry such strong implications. In *New York Airways*, our predecessor court held that Congress's failure to appropriate sufficient funds to pay for services at a rate set by a government agency did not defeat the obligation to pay the full amount. 369 F.2d at 746. Floor debates indicated that "Congress was well-aware that the Government would be legally obligated to pay . . . even if the appropriations were deficient." *Id.* The court noted that Congress viewed the obligation "as a contractual obligation enforceable in the courts which could be avoided only by changing the substantive law under which the Board set the rates, rather than by curtailing appropriations," and the agency made its similar view of the obligation clear to Congress. *Id.* at 747.

Here, the risk corridors program is an incentive program, not a quid pro quo exchange for services rendered like that in *New York Airways*. Moreover, it is much clearer here that Congress understood the appropriations riders to suspend substantive law, inasmuch as the appropriations riders directly responded to GAO's identification of only two sources of funding for the program.

In *Gibney*, a statute provided that certain employees of the Immigration and Naturalization Service would be paid overtime at a particular rate. Two subsequent statutes extended a more stringent overtime rate to other federal employees, while expressly leaving the prior rate for INS in place. A rider in an appropriations bill provided that "none of the funds appropriated for the Immigration and Naturalization Service shall be used to pay compensation for overtime services other than as provided in" the latter two acts. 114 Ct. Cl. at 48–49. INS agents who received overtime payments at the more stringent

rate fixed in the latter acts sought payment at the earlier rate.

That rider, according to the *Gibney* court, constituted "a mere limitation on the expenditure of a particular fund and had no other effect," so it could not limit the overtime rate available to an INS agent. *Id.* at 51. But the court's holding ultimately rested on a different point—that limiting overtime payments "as provided in" the new acts had no effect on the rate for INS agents, since the new acts expressly preserved their special overtime rate. The appropriations rider did "not even purport to affect the right of immigration inspectors to overtime pay as provided in the" earlier act. *Id.* at 55. The interpretation of the appropriations riders in *Gibney* cannot be viewed in isolation of its alternative holding, and there is no safety valve built into the ACA to preserve the government's obligation notwithstanding Congress's suspension of it. Accordingly, *Gibney* is inapposite.

After oral argument in this case had occurred, Moda filed a citation of supplemental authority as permitted by Rule 28(j) of the Federal Rules of Appellate Procedure, indicating that HHS had released a proposed budget for FY 2019, including a proposal indicating an $11.5 billion outlay for risk corridors payments in FY 2018 (reflective of the effect of sequestration on the total $12.3 billion outstanding) and noting a "legislative proposal to fully fund the Risk Corridors Program." *See* Appellee's Fed. R. App. P. 28(j) Notice Suppl. Auth. ("Moda 28(j) Letter") (Feb. 16, 2018), ECF No. 83, Exh. A (*Putting America's Health First, FY 2019 President's Budget for HHS* at 51 & n.5 & n.7, 54, 93 n.7 (2018)).[7]

---

[7] A revised budget, released just days after Moda submitted the initial draft to the court, omitted the language Moda referred to. *See generally Putting America's*

According to Moda, this refutes the government's positions on its statutory claims. In particular, Moda states, "if the appropriation riders had substantively amended the ACA, the government would have no basis now to be proposing to appropriate funds to fulfill the entirety of its [risk corridor] obligations." Moda 28(j) Letter at 2.

Moda again misunderstands the inquiry. The question is what intent was communicated by Congress's enactments in the appropriations bills for FY 2015–2017. It is irrelevant that a subsequent Administration proposed a budget that set aside funds to make purported outstanding risk corridors payments. Of course, Congress could conceivably reinstate an obligation to make full payments, even now after the program has concluded. But the proposed budget does not place that question before us.

The intent of Congress remains clear. After GAO identified only two sources of funding for the risk corridors program—payments in and the CMS Program Management fund—Congress cut off access to the only fund drawn from taxpayers. A statement discussing that enactment acknowledged "that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect." 160 Cong. Rec. H9838. Congress could have meant nothing else but to cap the amount of payments out at the amount

---

*Health First, FY 2019 President's Budget for HHS* (2018) (rev. Feb. 19, 2018), https://www.hhs.gov/sites/default/files/fy2019-budget-in-brief.pdf. The budget released by the White House, however, included remnants of HHS's initial draft. *An American Budget, Budget of the U.S. Government, Fiscal Year 2019* at 132, 141 (2018), OMB https://www.whitehouse.gov/wp-content/uploads/2018/02/budget-fy2019.pdf.

of payments in for each of the three years it enacted appropriations riders to that effect.

Moda contends that this result is inconsistent with the purpose of the risk corridors program. Perhaps. But it also seems that Congress expected the program to have minimal, if any, budget impact (even though we hold the text of section 1342 allowed for unbounded budget impact). Congress could not have predicted the shifting sands of the transitional policy implemented by HHS, which Moda blames for the higher costs it and other insurers bore through their participation in the exchanges. In response to that turn of events, Congress made the policy choice to cap payments out, and it remade that decision for each year of the program. We do not sit in judgment of that decision. We simply hold that the appropriations riders carried the clear implication of Congress's intent to prevent the use of taxpayer funds to support the risk corridors program.

Thus, Moda's statutory claim cannot stand.

## II.  Contract Claim

Moda also asserts an independent claim for breach of an implied-in-fact contract that purportedly promised payments of the full amount indicated by the statutory formula in exchange for participation in the exchanges.

The requirements for establishing a contract with the government are the same for express and implied contracts. *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). They are (1) "mutuality of intent to contract," (2) "consideration," (3) "lack of ambiguity in offer and acceptance," and (4) "actual authority" of the government representative whose conduct is relied upon to bind the government. *Lewis v. United States*, 70 F.3d 597, 600 (Fed. Cir. 1995).

Absent clear indication to the contrary, legislation and regulation cannot establish the government's intent

to bind itself in a contract. *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66 (1985). We apply a "presumption that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Id.* (quoting *Dodge v. Board of Educ.*, 302 U.S. 74, 79 (1937)). This is because the legislature's function is to make laws establishing policy, not contracts, and policies "are inherently subject to revision and repeal." *Id.* at 466.

Moda does not contend that the government manifested intent via the text of section 1342 alone. Indeed, the statute contains no promissory language from which we could find such intent. Instead, Moda alleges a contract arising "from the combination of [the statutory] text, HHS's implementing regulations, HHS's preamble statements before the ACA became operational, and the conduct of the parties, including relating to the transitional policy." Appellee's Br. 55.

The centerpiece of Moda's contract theory (and the foundation for the trial court's decision in this case) is *Radium Mines, Inc. v. United States*, 153 F. Supp. 403 (Ct. Cl. 1957). There, the Atomic Energy Commission issued regulations titled "Ten Year Guaranteed Minimum Price," in order "[t]o stimulate domestic production of uranium." *Id.* at 404–05. The regulations established guaranteed minimum prices for uranium delivered to the commission, with specific conditions required for entitlement to the minimum price. *Id.*

The court observed that the title of the regulation indicated that the government would "guarantee" the prices recited and that the regulation's "purpose was to induce persons to find and mine uranium," when, due to restrictions on private transactions in uranium, "no one could have prudently engaged in its production unless he was assured of a Government market." *Id.* at 405–06.

The court rejected the government's position that the regulations constituted a mere invitation to make an offer, holding instead that the regulation itself constituted "an offer, which ripened into a contract when it was accepted by the plaintiff's putting itself into a position to supply the ore or the refined uranium described in it." *Id.* at 405.

Moda contends that here, the statute, its implementing regulations, and HHS's conduct all evinced the government's intent to induce insurers to offer plans in the exchanges without an additional premium accounting for the risk of the dearth of data about the expanded market, in reliance on the presence of a fairly comprehensive safety net. But the overall scheme of the risk corridors program lacks the trappings of a contractual arrangement that drove the result in *Radium Mines*. There, the government made a "guarantee," it invited uranium dealers to make an "offer," and it promised to "offer a form of contract" setting forth "terms" of acceptance. *Id.* at 404–05; *see N.Y. Airways*, 369 F.2d at 752 (finding intent to form a contract where Congress specifically referred to "Liquidation of Contract Authorization"). Not so here.

The risk corridors program is an incentive program designed to encourage the provision of affordable health care to third parties without a risk premium to account for the unreliability of data relating to participation of the exchanges—not the traditional quid pro quo contemplated in *Radium Mines*. Indeed, an insurer that included that risk premium, but nevertheless suffered losses for a benefit year as calculated by the statutory and regulatory formulas would still be entitled to seek risk corridors payments.

Additionally, the parties in *Radium Mines*, one of which was the government, never disputed that the government intended to form some contractual relationship at some time throughout the exchange. The only

question there was whether the regulations themselves constituted an offer, or merely an invitation to make offers. *Radium Mines* is only precedent for what it decided. *See Orenshteyn v. Citrix Sys., Inc.*, 691 F.3d 1356, 1360 (Fed. Cir. 2012) ("Generally, when an issue is not discussed in a decision, that decision is not binding precedent.").

Here, no statement by the government evinced an intention to form a contract. The statute, its regulations, and HHS's conduct all simply worked towards crafting an incentive program. These facts cannot overcome the "well-established presumption" that Congress and HHS never intended to form a contract by enacting the legislation and regulation at issue here.

Accordingly, Moda cannot state a contract claim.

\* \* \*

Because we conclude that the government does not owe Moda anything in excess of its pro rata share of payments in, we need not address whether payments were due annually or only at the end of the three-year period covered by the risk corridors program.

CONCLUSION

Although section 1342 obligated the government to pay participants in the exchanges the full amount indicated by the formula for risk corridor payments, we hold that Congress suspended the government's obligation in each year of the program through clear intent manifested in appropriations riders. We also hold that the circumstances of this legislation and subsequent regulation did not create a contract promising the full amount of risk corridors payments. Accordingly, we hold that Moda has failed to state a viable claim for additional payments under the risk corridors program under either a statutory or contract theory.

**REVERSED**

Costs

The parties shall bear their own costs.

# United States Court of Appeals
# for the Federal Circuit

---

**MODA HEALTH PLAN, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2017-1994

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00649-TCW, Judge Thomas C. Wheeler.

---

NEWMAN, *Circuit Judge*, dissenting.

The United States and members of the health insurance industry, in connection with the program referred to as "Obamacare," agreed to a three-year plan that would mitigate the risk of providing low-cost insurance to previously uninsured and underinsured persons of unknown health risk. This risk-abatement plan is included in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA). As described by the

Court of Federal Claims,[1] the "risk corridors" provision accommodates the unpredictable risk of the extended healthcare programs. By this provision, the government will "'share in profits or losses resulting from inaccurate rate setting from 2014 to 2016.'" Fed. Cl. Op., 130 Fed. Cl. at 444 (quoting *HHS Notice of Benefit and Payment Parameters for 2014*, 77 Fed. Reg. 73,118, 73,121 (Dec. 7, 2012)). The risk corridors program was enacted as Section 1342 of the Affordable Care Act, and is codified in Section 18062 of Title 42. Subsection (a) is as follows:

> The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of [the Medicare Act].

42 U.S.C. § 18062(a). The statute contains a detailed formula for this risk corridors sharing of profits and losses. Healthcare insurers throughout the nation, including Moda Health Plan, accepted and fulfilled the new healthcare procedures, in collaboration with administration of the ACA by the Centers for Medicare and Medicaid Services (CMS) in the Department of Health and Human Services (HHS).

Many health insurers soon experienced losses, attributed at least in part to a governmental action called

---

[1]     *Moda Health Plan, Inc. v. United States,* 130 Fed. Cl. 436 (2017) ("Fed. Cl. Op.").

the "transitional policy." Reassurance was presented, and Moda (and others) continued to perform their obligations. Although the government continued to collect "payments in" from insurers who more accurately predicted risk, the government has declined to pay its required risk corridors amounts, by restricting the funds available for the "payments out."

The Court of Federal Claims held the government to its statutory and contractual obligations to Moda. My colleagues do not. I respectfully dissent.

### *The Court of Federal Claims interpreted the statute in accordance with its terms*

The ACA provides the risk corridors formula, establishing that the insurer will make "payments in" to the government for the insurer's excess profits as calculated by the formula, and "payments out" from the government for the insurer's excess losses. The formula was enacted into statute:

> The Secretary shall provide under the program established under subsection (a) that if—
>
> **(A)** a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>
> **(B)** a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

42 U.S.C. § 18062(b). In March 2012, HHS issued regulations for the risk corridors program, stating that Qualified

Health Plans (QHPs) "will receive payment" or "must remit charges" depending on their gains or losses. 45 C.F.R. § 153.510(b), (c). In March 2013, HHS stated:

> The risk corridors program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required under section 1342 of the Affordable Care Act.

*HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. 15410, 15473 (Mar. 11, 2013) (JA565). Moda cites this reassurance, as Moda continued to offer and implement healthcare policies in accordance with the Affordable Care Act.

The "transitional policy" resulted in a change in the risk profile of participants in the Affordable Care Act. Moda states that "many individuals who had previously passed medical underwriting, and were considerably healthier than the uninsured population, maintained their existing insurance and did not enroll in QHPs," Moda Br. 7–8, thereby reducing the amount of premiums collected from healthier persons. HHS stated, in announcing the transitional policy, that "the risk corridor program should help ameliorate unanticipated changes in premium revenue." Letter from Gary Cohen, Dir., CMS Ctr. for Consumer Info. and Ins. Oversight ("CCIIO"), to State Ins. Comm'rs at 3 (Nov. 14, 2013) (JA431).

The transitional policy was initially announced as applying only until October 1, 2014. *Id.* at 1 (JA429). However, it was renewed throughout the period here at issue. Memorandum from Kevin Counihan, Dir., CMS CCIIO (Feb. 29, 2016) (JA457).

### *The risk corridors obligations were not cancelled by the appropriations riders*

In April 2014, HHS-CMS issued an "informal bulletin" stating, "We anticipate that risk corridors collections

will be sufficient to pay for all risk corridors payments. However, if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall." Memorandum from CMS CCIIO, Risk Corridors and Budget Neutrality (Apr. 11, 2014) (JA229). HHS also stated "that the Affordable Care Act requires the Secretary to make full payments to issuers," and that it was "recording those amounts that remain unpaid . . . [as an] obligation of the United States Government for which full payment is required." Memorandum from CMS CCIIO, Risk Corridors Payments for the 2014 Benefit Year (Nov. 19, 2015) (JA245).

The issue on this appeal is focused on the interpretation and application of the "rider" that was attached to the omnibus annual appropriations bills. This rider prohibits HHS from using its funds, including its bulk appropriation, to make risk corridors payments. My colleagues hold that this rider avoided or indefinitely postponed the government's risk corridors obligations. The Court of Federal Claims, receiving this argument from the United States, correctly discarded it.

Meanwhile, the risk corridors statute was not repealed or the payment regulations withdrawn, despite attempts in Congress. Moda continued to perform its obligations in accordance with its agreement with the CMS's administration of the Affordable Care Act.

### *A statute cannot be repealed or amended by inference*

To change a statute, explicit legislative statement and action are required. Nor can governmental obligations be eliminated by simply restricting the funds that might be used to meet the obligation. The appropriation riders that prohibited the use of general HHS funds to pay the government's risk corridors obligations did not erase the

obligations. The Court of Federal Claims correctly so held.

The mounting problems with the Affordable Care Act did not go unnoticed. In September 2014, the General Accountability Office (GAO) responded to an inquiry from Senator Jeff Sessions and Representative Fred Upton, and stated that "the CMS PM [Centers for Medicare Services-Program Management] appropriation for FY 2014 would have been available for making the payments pursuant to section 1342(b)(1)." Letter from Susan A. Poling, GAO Gen. Counsel, to Sen. Jeff Sessions and Rep. Fred Upton 4 (Sept. 30, 2014) (JA237) ("Poling Letter"). The GAO also stated that "payments under the risk corridors program are properly characterized as user fees" and could be used to make payments out. *Id.* at 6 (JA239). This review also cited the available recourse to the general CMS assessment. However, in December 2014, the appropriations bill for that fiscal year contained a rider that prohibited HHS from using various funds, including the CMS PM funds, for risk corridors payments. The rider stated:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services-Program Management" account, may be used for payments under section 1342(b)(1) of [the ACA] (relating to risk corridors).

Pub. L. No. 113-235, § 227, 128 Stat. 2130, 2491 (2014). Similar riders were included in the omnibus appropriations bills for the ensuing years. As the Court of Federal Claims recited, by September 2016, after collecting all payments in for the 2015 year, it was clear that all payments in would be needed to cover 2014 losses, and that no payments out would be made for the 2015 plan year.

Moda states: "The Government owed Moda $89,426,430 for 2014 and $133,951,163 for 2015, but only paid $14,254,303 for 2014 and nothing for 2015, leaving a $209,123,290 shortfall." Moda Br. 10.

The panel majority ratifies an "indefinite suspension" of payment, stating that this was properly achieved by cutting off the funds for payment. The majority correctly states that "the government's statutory obligation to pay persisted independent of the appropriation of funds to satisfy that obligation." Maj. Op. at 18. However, the majority then subverts its ruling, and holds that the government properly "indefinitely suspended" compliance with the statute.[2]

In *United States v. Will*, the Court explained that "when Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that . . . it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.'" 449 U.S. 200, 222 (1980) (citing *United States v. Dickerson*, 310 U.S. 554, 555 (1940)). However, this intent to suspend or repeal the statute must be expressed: "The whole question depends on the intention of Congress as expressed in the statutes." *United States v. Mitchell*, 109 U.S. 146, 150 (1883).

"The cardinal rule is that repeals by implication are not favored." *Posadas v. Nat'l City Bank*, 296 U.S. 497,

---

[2] The panel majority, responding to this dissent, states that it is not ratifying an indefinite suspension of payment. Maj. Op. at 25, n.6. However, payment has not been made, and the majority finds "the clear implication of Congress's intent to prevent the use of taxpayer funds to support the risk corridors program." Maj. Op. at 32. Thus Moda, and the other participating insurers, have been forced into the courts.

503 (1936). "The doctrine disfavoring repeals by implication 'applies with full vigor when . . . the subsequent legislation is an *appropriations* measure,'" as here. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (citing *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 785 (D.C. Cir. 1971)). As the Court of Federal Claims observed:

> Repealing an obligation of the United States is a serious matter, and burying a repeal in a standard appropriations bill would provide clever legislators with an end-run around the substantive debates that a repeal might precipitate.

Fed. Cl. Op., 130 Fed. Cl. at 458..

The classic case of *United States v. Langston*, 118 U.S. 389 (1886), speaks clearly, that the intent to repeal or modify legislation must be clearly stated, in "words that expressly or by clear implication modified or repealed the previous law." *Id.* at 394. The Court explained that a statute should not be deemed abrogated or suspended unless a subsequent enactment contains words that "expressly, or by clear implication, modified or repealed the previous law." *Id.*

My colleagues dispose of *Langston* as an "extreme example," stating that subsequent decisions are more useful since *Langston* is a "century and a half" old. Maj. Op. at 21–22. Indeed it is, and has stood the test of a century and a half of logic, citation, and compliance. Nonetheless discarding *Langston*, the panel majority finds intent to change the government's obligations under the risk corridors statute. The majority concludes that "Congress clearly indicated its intent" to change the government's obligations, reciting two factors:

First, the majority concludes that the appropriations riders were a response to the GAO's guidance that there were two available sources of funding for the risk corri-

dors program, and that Congress intended to remove the GAO-suggested source of funds from the HHS-CMS program management funds. My colleagues find that, by removing access to the HHS-CMS funds, Congress stated its clear intent to amend the statute and abrogate the payment obligation if the payments in were insufficient. *See* Poling Letter at 4-6 (JA237-39). Maj. Op. at 24. However, they point to no statement in the legislative history suggesting that the rider was enacted in response to the GAO's report.

Next, my colleagues look to the remarks of Chairman Harold Rogers to discern intent. He stated:

> In 2014, HHS issued a regulation stating that the risk corridor program will be budget neutral, meaning that the federal government will never pay out more than it collects from issuers over the three year period risk corridors are in effect. The agreement includes new bill language to prevent CMS Program Management appropriation account from being used to support risk corridors payments.

160 Cong. Rec. H9307, H9838 (daily ed. Dec. 11, 2014) (explanatory statement submitted by Rep. Rogers, Chairman of the House Comm. on Appropriations, regarding the House Amendment to the Senate Amendment on H.R. 83, the Consolidated and Further Continuing Appropriations Act, 2015). Chairman Rogers is referring to the April 2014 "guidance," where HHS stated that they "anticipate that risk corridors collections will be sufficient to pay for all risk corridors payments." Memorandum from CMS CCIIO, Risk Corridors and Budget Neutrality (Apr. 11, 2014) (JA229). In that guidance, HHS was stating its understanding that "risk corridors collections [might be] insufficient to make risk corridors payments for a year." *Id.*

In 2014, a bill to require budget neutrality in the operation of the risk corridors program was introduced. Obamacare Taxpayer Bailout Protection Act, S. 2214, 113th Cong. (2014). The proposed legislation sought to amend Section 1342(d) of the ACA to ensure budget neutrality of payments in and payments out. The bill stated:

> In implementing this section, the Secretary shall ensure that payments out and payments in under paragraphs (1) and (2) of subsection (b) are provided for in amounts that the Secretary determines are necessary to reduce to zero the cost . . . to the Federal Government of carrying out the program under this section.

*Id.* at § 2(d). The proposal, introduced by Senator Marco Rubio on April 7, 2014, was an effort to change the risk corridors program. The change was proposed, but not enacted, providing an indication of legislative intent.[3]

We have been directed to no statement of abrogation or amendment of the statute, no disclaimer by the government of its statutory and contractual commitments.

---

[3] The panel majority argues that "we need not" consider Congress' refusal to enforce budget neutrality in the risk corridors program. Maj. Op. at 28. The Court has stated otherwise: "When the repeal of a highly significant law is urged upon that body and that repeal is rejected after careful consideration and discussion, the normal expectation is that courts will be faithful to their trust and abide by that decision." *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 210 (1962), *overruled on other grounds by Boys Mkts., Inc. v. Retail Clerks Union, Loc. 770*, 398 U.S. 235 (1970).

However, the government has not complied with these commitments—leading to this litigation.

The standard is high for intent to cancel or amend a statute. The standard is not met by the words of the riders. "[T]he intention of the legislature to repeal must be clear and manifest." *Posadas*, 296 U.S. at 503. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550 (1974) (citing *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 456–57 (1945)). Here, where there is no irreconcilable statute, repeal by implication is devoid of any support.

The panel majority does not suggest that intent to repeal can be found in the rider itself. Nor can intent be inferred from any evidence in the record. It is clear that Congress knew what intent would have looked like, because members of Congress tried, and failed, to achieve budget neutrality in the risk corridors program.

Instead, my colleagues hold that the statutory obligation was not repealed, but only "temporarily suspended." The unenacted text of the proposed "Bailout Act," reproduced *supra*, would have accomplished the result of budget neutrality that the majority finds was achieved by the riders. Congress' decision to forego this proposed repeal is highly probative of legislative intent.

Precedent does not deal favorably with repeal by implication—the other ground on which my colleagues rely. The panel majority relies heavily on *United States v. Vulte*, 233 U.S. 509 (1914). However, *Vulte* supports, rather than negates, the holding of the Court of Federal Claims. The facts are relevant: Lt. Vulte's pay as a lieutenant in the Marine Corps for service in Porto Rico was initially based on the Army's pay scale, and in 1902 Congress implemented a ten percent bonus for officers of his pay grade. In the appropriations acts for foreign

service, for 1906 and 1907, Congress excluded officers serving in Porto Rico from receiving the bonus. In the act for 1908, the appropriations act continued the 10% bonus but did not mention an exclusion for service in Porto Rico. Lieutenant Vulte sought the bonus for 1908. The government argued that the 1906 and 1907 acts effectively repealed the 1902 bonus. The Court disagreed, and held that although the bonus was restricted for 1906 and 1907, the 1902 act was not repealed, and he was entitled to the 1908 bonus. *Id.* at 514.

The panel majority concludes that *Vulte* established a rule of "effective suspensions-by-appropriations." Maj. Op. at 26. That is not a valid conclusion. The Court held that, by altering the bonus for 1906 and 1907, Congress cannot have intended to effectuate a permanent repeal of the 1902 statute. *Vulte*, 233 U.S. at 514-15. And *Vulte* did not retroactively strip the officers of pay for duties they had performed while subject to the higher pay. On the question of whether an annual appropriations rider can permanently abrogate a statute, the *Vulte* Court stated:

> 'Nor ought such an intention on the part of the legislature to be presumed, unless it is expressed in the most clear and positive terms, and where the language admits of no other reasonable interpretation.' This follows naturally from the nature of appropriation bills, and the presumption hence arising is fortified by the rules of the Senate and House of Representatives.

*Id.* at 515 (quoting *Minis v. United States*, 40 U.S. 423, 445 (1841)). The panel majority's contrary position is not supported.

The panel majority also relies on *United States v. Mitchell*, 109 U.S. 146 (1883), to support the majority's ruling of "temporary suspension." Again, the case does not support the position taken by my colleagues. In

*Mitchell* an appropriations act initially set the salaries of interpreters at $400 or $500. A subsequent appropriation, five years later, set "the appropriation for the annual pay of interpreters [at] $300 each, and a large sum was set apart for their additional compensation, to be distributed by the secretary of the interior at his discretion." *Id.* at 149. The Court stated, "[t]he whole question depends on the intention of congress as expressed in the statutes," *id.* at 150, and observed that the statute clearly stated the number of interpreters to be hired, the salary for those interpreters, and the appropriation of an additional discretionary fund to cover additional compensation. *Id.* at 149.

The relevance of *Mitchell* is obscure, for the Court found the clear intent to change interpreters' pay for the subsequent years. There is no relation to the case at bar, where the majority holds that an appropriations rider can change the statutory obligation to compensate for past performance under an ongoing statute. However, *Mitchell* does reinforce the rule that repeal or suspension of a statute must be manifested by clearly stated intent to repeal or suspend. Also, like *Vulte*, the act that in *Mitchell* was "suspended" by a subsequent appropriation was itself an appropriation, not legislation incurring a statutory obligation. The appropriation rider in *Mitchell* simply modified an existing appropriation. In Moda's situation, however, the panel majority holds that the appropriation rider can suspend the authorizing legislation. No such intent can be found in the statute, as *Mitchell* requires and as the statute in that case provided.

The panel majority's theory is not supported by *Mitchell* and *Vulte*, for the statutes in both cases contain the clearly stated intent to modify existing appropriations. Moda's situation is more like that in *Langston*, where the Court stated:

> it is not probable that congress . . . should, at a subsequent date, make a permanent reduction of his salary, without indicating its purpose to do so, either by express words of repeal, or by such provisions as would compel the courts to say that harmony between the old and the new statute was impossible.

*Langston*, 118 U.S. at 394. Similarly, it is not probable that Congress would abrogate its obligations under the risk corridors program, undermining a foundation of the Affordable Care Act, without stating its intention to do so. The appropriations riders did not state that the government would not and need not meet its statutory commitment.

### *Precedent supports the decision of the Court of Federal Claims*

In *New York Airways, Inc. v. United States*, the Court of Claims held that the "mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." 369 F.2d 743, 748 (Ct. Cl. 1966) (citing *Vulte, supra*). The Civil Aeronautics Board had provided subsidies to helicopter carriers according to a statute whose appropriation provision stated:

> For payments to air carriers of so much of the compensation fixed and determined by the Civil Aeronautics Board under section 406 of the Federal Aviation Act of 1958 (49 U.S.C. § 1376), as is payable by the Board, including not to exceed $3,358,000 for subsidy for helicopter operations during the current fiscal year, $82,500,000, to remain available until expended.

*Id.* at 749 (citing 78 Stat. 640, 642 (1964)). However, the appropriation cap was not sufficient to cover the statutory

obligation. The Court of Claims held that the insufficient appropriation did not abrogate the government's obligations to make payments. The court stated that "the failure of Congress or an agency to appropriate or make available sufficient funds does not repudiate the obligation; it merely bars the accounting agents of the Government from disbursing funds and forces the carrier to a recovery in the Court of Claims." *Id.* at 817.

Precedent also illustrates the circumstances in which intent to repeal or suspend may validly be found. In *Dickerson*, Congress had in 1922 enacted a reenlistment bonus for members of the armed forces who reenlisted within three months. For each year between 1934 and 1937 an appropriations rider stated that the reenlistment bonus "is hereby suspended." *Dickerson*, 310 U.S. at 556. For fiscal year 1938, the appropriations rider did not contain the same language, but stated that:

> no part of any appropriation contained in this or any other Act for the fiscal year ending June 30, 1939, shall be available for the payment' of any enlistment allowance for 'reenlistments made during the fiscal year ending June 30, 1939 . . . .'

*Id.* at 555. The rider in *Dickerson* cut off funding from *all* sources, stating "no part of any appropriation contained in this or any other Act . . . shall be available." *Id.* The Court held that the new language continued to suspend the bonus statute, for the words, and the accompanying Congressional Record, display the clear intent to discontinue the bonus payment. The Record stated: "We have not paid [the enlistment bonus] for 5 years, and the latter part of this amendment now before the House is a Senate amendment which discontinues for another year the payment of the reenlistment allowances." 83 Cong. Rec. 9677 (1938) (statement of Rep. Woodrum). The Record and the statutory language left no doubt of congressional intent to continue the suspension of reenlistment bonuses.

The panel majority recognizes that the Court in *Dickerson* found "persuasive evidence" of "Congress's intent to suspend the reenlistment bonus." Maj. Op. at 23.

In *United States v. Will*, the Court considered statutes setting the salary of government officials including federal judges. 449 U.S. at 202. In four consecutive years, appropriations statutes had held that these officials would not be entitled to the cost-of-living adjustments otherwise paid to government employees. The annual blocking statutes were in various terms. In one year, the statute stated that the cost-of-living increase "shall not take effect" for these officials. *Id.* at 222. For two additional years, the appropriations statutes barred the use of funds appropriated "by this Act or any other Act," as in *Dickerson. See Will*, 449 U.S. at 205-06, 207. The fourth year's appropriation contained similar language, stating that "funds available for payments . . . shall not be used." *Id.* at 208. In each year, the language stated the clear intent that federal funds not be used for these cost-of-living adjustments.

The panel majority finds support in *Will*, and states that "the Supreme Court never considered the impact of that language in *Dickerson* or *Will*." Maj. Op. at 25. However, in *Dickerson* the Court twice repeated the "any other Act" language, *Dickerson*, 310 U.S. at 555, 556, in concluding that the language supported the intentional suspension. And in *Will*, the Court explicitly stated that the statutory language was "intended by Congress to block the increases the Adjustment Act otherwise would generate." *Will*, 449 U.S. at 223.

The Court found legislative intent clear in these cases. In contrast, the appropriations rider for risk corridors payments does not purport to change the government's statutory obligation, even as it withholds a source of funds for the statutory payment. My colleagues' ratification of some sort of permanent postponement denies the

legislative commitment of the government and the contractual understanding between the insurer and HHS-CMS.

### *The riders cannot have retroactive effect after inducing participation*

The creation of the risk corridors program as an inducement to the insurance industry to participate in the Affordable Care Act, and their responses and performance, negate any after-the-fact implication of repudiation of the government's obligations.

The government argued before the Court of Federal Claims that its obligations to insurers did not come due until the conclusion of the three year risk corridors program, and that "HHS has until the end of 2017 to pay Moda the full amount of its owed risk corridors payments, and Moda's claims are not yet ripe because payment is not yet due." Fed. Cl. Op., 130 Fed. Cl. at 451. We have received no advice of payments made at the end of 2017 or thereafter.

The appropriations rider cannot have retroactive effect on obligations already incurred and performance already achieved. Retroactive effect is not available to "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Such clear intent is here absent.

Removal of Moda's right to risk corridors payments would "impair rights a party possessed when [it] acted," a "disfavored" application of statutes, for "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implica-

tion." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (quoting *United States v. St. Louis, S.F. & Tex. Ry. Co.*, 270 U.S. 1, 3 (1926)). Such premises are absent here.

### *Moda has recourse in the Judgment Fund*

The Government does not argue that the Judgment Fund would not apply if judgment is entered against the United States, in accordance with Section 1491:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491.

The Judgment Fund is established "to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when . . . payment is not otherwise provided for . . . ." 31 U.S.C. § 1304(a); *see also* 28 U.S.C. §2517 ("Except as provided by chapter 71 of title 41, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor.").

### *The contract claim is also supported*

The Court of Federal Claims also found that the risk corridors statute is binding contractually, for the insurers and the Medicare administrator entered into mutual commitments with respect to the conditions of performance of the Affordable Care Act. The Court of Federal Claims correctly concluded that an implied-in-fact contract existed between Moda and the government. I do not

share my colleagues' conclusion that "Moda cannot state a contract claim." Maj. Op. at 35.

CONCLUSION

The government's ability to benefit from participation of private enterprise depends on the government's reputation as a fair partner. By holding that the government can avoid its obligations after they have been incurred, by declining to appropriate funds to pay the bill and by dismissing the availability of judicial recourse, this court undermines the reliability of dealings with the government.

I respectfully dissent from the panel majority's holding that the government need not meet its statutory and contractual obligations established in the risk corridors program.